**POLISKIE LINE OCEANICZNE a/k/a Polish Ocean Line, Plaintiff,**

v.

**HOOKER CHEMICAL CORP., Defendant and Third–Party Plaintiff,**

v.

**ALBERT E. BOWEN, INC., Third–Party Defendant.**

**No. 78 Civ. 2694 (CLB).**

United States District Court, S. D. New York.

April 8, 1980.

Freehill, Hogan & Mahar, New York City, for plaintiff, by Philip V. Moyles, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant and third party plaintiff by Vincent L. Leibell, Jr., New York City, of counsel.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By complaint filed June 13, 1978, plaintiff Poliskie Line Oceaniczne ("Polish Ocean Line") seeks damages against Hooker Chemical Corporation, arising out of a shipment by defendant of sulphur dichloride on plaintiff's vessel, the M/V FRANCISZEK ZUBRZYCKI.

As an admiralty and maritime claim, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and Rule 9(h), F.R.Civ.P.

The third party action was severed, and by stipulation of the parties, only liability was tried before this Court, without a jury, on October 16 and 26, 1979.

The following constitutes my findings of fact and conclusions of law on the issue of liability.

Defendant arranged to ship 58 drums of sulphur dichloride "house to house" to Cyanamid B.V. in Rotterdam. Pursuant to these arrangements, plaintiff released an empty container, which was approximately one year old and in good condition, to defendant. The drums were stowed by the defendant in the following general pattern:

The last seven drums were banded together with steel straps. Two seven and one-half foot long two by fours were nailed into the container floor against these last drums. No dunnage was placed in the spaces between the drums, or in the space at the rear of the container. A seal was affixed to the container, which was transported to plaintiff's Newark, New Jersey pier, where it arrived in apparent good condition.

Plaintiff loaded and lashed the container on the starboard side of the No. 4 hold hatch cover, middle tier, in a stack of three 40 ft. containers.

The vessel sailed from Newark on February 26, 1977 to Baltimore, Maryland and Wilmington, North Carolina to discharge and load cargo; however, there was no such activity in hold No. 4 after the vessel left the Port of New York.

The vessel sailed for Rotterdam on March 1, 1977. The weather was rough over the next few days. On March 4th, at sea, smoke, fumes and an odor of sulphur were found to be emanating from the container. Professor Gatos, a professor at M.I.T. in the Department of Material Science and Engineering testified that the release of sulphur dichloride will immediately lead to smoke and odor, particularly upon interacting with water vapor in the air, which produces hydrochloric acid, hydrogen sulphide and other acids containing sulphur. Some of these substances are severe irritants to the nose, eyes and lungs. (Tr. p. 150).

Upon opening the container, it was found that the drums had moved, and several drums were damaged and had leaked. Four drums were then thrown overboard. The rest of the drums were restowed by ship's personnel, with wedges and coconut mats.

On March 7th at sea vapors were noticed again, but the container was not opened. There was no further problem with the container until the ship arrived at Rotterdam.

In Rotterdam, severe problems ensued. The vessel's agents, two representatives from Cyanamid and government officials boarded the vessel. Mr. Adrianus Van Bedaf, safety inspector for Cyanamid, entered the container in a protective suit. He found heavy smoke, the bottom of the container was wet, the walls were covered with sulphur powder, which he said indicated that there had been heavy reactions in the container, drums were corroded on the bottom, and some were leaking. Soda ash was used to try to neutralize the chemical, but despite this remedial step, that evening there was an explosion within the container, producing fumes and smoke. The crew and passengers were evacuated and given medical treatment. The container was removed from the vessel and by direction of local port officials, was taken by barge to a location in the North Sea where the chemicals were disposed of by dumping.

In this action, plaintiff seeks damages resulting from the problems with the container of sulphur dichloride. Plaintiff urges that defendant is liable for such damages because the proximate cause of the difficulties was the defendant's improper stowage of the drums in the container.

■ I find initially that the defendant negligently stowed the container in violation of the Code of Federal Regulations (C.F.R.). Sulphur dichloride is classified as a hazardous material by 49 C.F.R. § 172.101, and as such, may not be transported by vessel unless it is prepared for transportation in accordance with the regulations contained in Title 49. 49 C.F.R. §§ 176.1, 176.3, 176.5. Section 176.76 requires that:

"(1) The material must be in proper condition for transportation according to the requirements of this subchapter;

(2) All packages in the . . . container must be secured to prevent movement in any direction . . . ;

(3) Bulkheads made of dunnage which extend to the level of the cargo must be provided unless the packages are stowed flush with the sides or ends;

(4) Dunnage must be secured to the floor when the cargo consists of dense materials or heavy packages;

\* \* \* \* \* \*

(6) Any slack spaces between packages must be filled with dunnage."

George Frazier, a "shipper" for defendant, was the person responsible for loading the container; however, he did not design the stowage plan (Ex. 3 at 5, 12). He testified that no dunnage or bracing was placed in the spaces between the drums or between the drums and the door of the container, *Id.* at 13–16, and nobody instructed him to place dunnage there. Defendant's failure to secure its cargo with dunnage violated 49 C.F.R. § 176.76.

In addition, Mr. Frazier testified that he had never heard of the regulations dealing with the shipment of hazardous cargo. Defendant thus violated 49 C.F.R. § 173.1(b), which requires that "[i]t is the duty of each person who offers hazardous materials for transportation to instruct each of his officers, agents, and employees having any responsibility for preparing hazardous materials for shipment as to applicable regulations in this subchapter." (See, Dep. of Noel Strock, Ex. 8 at pp. 14–17).

In addition to the violations of these regulations, which would constitute negligence *per se*, there was a consensus among the expert witnesses which supports a finding that defendant's stowage was done negligently. Donald W. Gates, Vice President and Chief Surveyor of the National Cargo Bureau, Inc., a private, non–profit service organization which surveys the loading of cargoes, explained that when placing drums in a container "[t]he basic goal is to, by placing the drums tight in relation to each other, to eliminate in the stowage within the container of the drums all slack space and then beyond that, any slack space remaining must be secured to prevent motion." Tr. at 23. When showed a diagram of Hooker's stowage plan, Mr. Gates stated

that "the drums are not properly placed in the container to eliminate slack space . . . there would be a great deal of securing required to prevent them from moving." Tr. p. 26. Other experts arrived at a similar conclusion, and there is no evidence to support a finding that the stowage was properly done. The defendants merely assert that they have used this method of stowage in the past without encountering any difficulties. This fact is, of course, irrelevant as to whether the stowage was negligently done, and insofar as such evidence may reflect on custom and usage, it is refuted by the expert testimony which the Court finds credible, and the usage is interdicted by federal regulations quoted above having the force of law.

Having found that defendant was negligent, it must be determined whether the negligence was the proximate cause of the damages. Defendant argues that even assuming, *arguendo*, that the container was negligently stowed, it was plaintiff's negligence and the rough weather which were the proximate causes of the damages.

■ The defendant relies on *Houlden & Co. v. S.S. RED JACKET*, 1977 A.M.C. 1382 (S.D.N.Y.1977), *aff'd on the opinion below*, 582 F.2d 1271 (2d Cir. 1978), for its contention that the plaintiff was negligent in issuing a bill of lading that did not require a description of how the hazardous cargo was stowed. The defendant quotes the following language from the district court decision:

"[Carrier] also knew as a result of the bill of lading that dense heavy cargo in the form of tin ingots was to go on its vessel to Japan. Although it had this knowledge, it failed to inquire of [Shipper] as to how the cargo had been secured. Significantly, the bill of lading failed to require a description of how the goods were packed and secured. Such a requirement might have put [Carrier] on notice that an inspection was in order. The court finds that [Carrier] was negligent in failing to require shippers of sealed house to house containers to disclose on the bill of lading the manner in which the cargo is

packed and secured within the container. It is not enough to require a description of the cargo as this case demonstrates." *Id.* at 1399.

Despite defendant's protestations in its Reply Brief that these findings were not *dicta*, if the term *dicta* is to have any meaning whatsoever, it must be applied here, since the court in *Red Jacket* expressly and clearly held that the improper stowage was *not* the proximate cause of the accident in that case. *Id.* at 1403. The case was decided, as all cases should be, on the facts before the court, which were markedly different in *Red Jacket*. There, the structural defects in the container were held to have caused the accident.

In any event, I find that the dock receipt here did comply with the language and spirit of the *Red Jacket* case, which suggests that the bill of lading contain a "description of how the goods were packed and secured." The dock receipt here included the following certification, required by 49 C.F.R. § 172.204(a), and signed by the defendant's employee, R. R. Russell:

"This is to certify that the above named articles are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation." Exhibit 4E.

This certification described the manner in which the goods were packed and secured by stating that the regulations, previously quoted, which spell out in some detail how a container should be stowed, were followed. In this respect the certification was false, but plaintiff did not know that. Had it known, then within *Red Jacket*, it would have been "on notice that an inspection was in order."

■ Defendant also urges that plaintiff failed to exercise due diligence in neglecting to have the interior stowage of the container inspected prior to sailing. This argument is without merit. The container was stowed by shipper, sealed, and shipped "house to house." Noel Strock, the defendant's Product Distribution Manager in the

International Division, testified in substance that the purpose of the seal is to insure the integrity of the contents of the container. He agreed that it had been Hooker's practice or desire that the seal be intact upon arrival at the port of destination. Ex. 4 at 39. Plaintiff's Claim Manager, Virginia McCambridge, and Mr. Van Bedaf of Cyanamid gave similar descriptions of the practice with respect to carriage of a sealed house to house container. Ex. 4 at 30, 49–50, and Ex. 1 at 44.

Although there was some testimony by plaintiff to the effect that it had no authority to open and inspect the packing, see Deposition of Virginia McCambridge, Ex. 4 at 7, this is clearly incorrect. The Master has control over all cargo once it is aboard ship. What the testimony does reflect is that it was not the current practice to open such a sealed house to house container unless there was a reason to do so. See, Deposition of Captain Roman Liszko, Ex. 5 at 40–41; Trial Tr. at 57.

■ It is clearly feasible for such an inspection to take place, and, in fact, subsequent to this accident, such inspections have been made. However, the issue for our determination is whether the plaintiff was negligent in not making an inspection of the interior of the container in this case. That it has now instituted new safety measures to prevent future accidents cannot be considered evidence that the carrier was negligent in this case. Rule 407, F.R.Evid.

■ In view of the recognized practice not to open a sealed container as to which shipper had certified compliance with applicable C.F.R. regulations, I find plaintiff had no cause to do so in the absence of any indication of a dangerous condition. I also find that this practice was not negligent. Plaintiff was entitled to rely on defendant's certification in the dock receipt that the stowage accorded with C.F.R. regulations, and it was not unreasonable or negligent for it to do so. Plaintiff had no legal obligation or duty to break the seal on this house to house container to inspect the stowage. See generally, *Blue Bird Food Products Co. v. Baltimore & Ohio R. Co.*, 492 F.2d 1329, 1332–33 (3d Cir. 1974).

■ Defendant argues that the "articles" which were certified were the drums rather than the container. Even if we substitute the word "drums" for "articles" in the certification, the result remains the same; the certification relates to the manner in which the articles were "packaged." The plaintiff received and carried a sealed container. I reject the contention that the certification did not apply to or cover the container.

Defendant also argues that the proximate causes of the casualty were the rough weather, and plaintiff's negligent placement of the container on the starboard side of the deck where it would be exposed to wave action, as well as its failure to have the lashings inspected.

■ I find that the most credible evidence of the wind and sea conditions during the voyage is found in the vessel's deck log. More general statements, such as those contained in some of the official summaries of the weather conditions, are entitled to less weight, see, Exs. 7–L, 5–G, because by their nature, as brief summaries covering several days, they do not contain the same degree of accuracy as the measurements in the log. Although the storm's greatest intensity occurred after the container was opened the first time, the vessel encountered stormy conditions both before and after the first incident with the container. There were strong winds and significant rolling of the ship. Such weather is foreseeable, and considered normal in the North Atlantic at that time of year. Deposition of Captain Roman Liszko, Ex. 5 at 52; Deposition of Jan Gmytrasiewicz, Ex. 7 at 24. Hooker, having undertaken to stow the drums in the container, was obligated to stow so that the container would meet the rigors of a normal voyage.

There is no question that the rough weather was a contributing factor in the accident; however, I find that it was not the proximate cause. I find credible the reconstruction of the accident by the expert witnesses. Philip Kimball, an employee of C. R. Cushing & Co., a firm of naval archi-

tects, marine engineers, and transportation consultants testified that the drums broke stow because the void space in the container was too great. Trial Tr. at 94–95. Mr. Van Bedaf explained that if dunnage is not placed in slack space, drums roll, making the space even bigger, and damage to the drums result because they "hammer together." Ex. 1 at 26.

Plaintiff alleged in its complaint that defendant failed to use drums of adequate quality, and failed to check the drums for defects before loading them into the container. There was no testimony to support the former contention. As to the latter, George Frazier, defendant's shipper, testified that no inspection had been made after the drums were filled, and before they were stowed. Ex. 3 at 43–44. There was no evidence to indicate whether the drums were inspected prior to filling them. There is no basis upon which this Court could find that the drums were defective.

Assuming that the drums were adequate and in good condition, the testimony suggests, and I find, that the movement of the drums within the container, resulting from the improper stowage, damaged the drums, causing the sulphur dichloride to leak. Once the chemical leaked out of the drums, it would begin to interact with sea water and/or water vapor present in the air of the container, forming corrosive compounds as some of the byproducts. See, Trial Tr. at 152, et seq. Mr. Van Bedaf testified that only a small leak and a little bit of water is necessary for a reaction to begin. The hydrochloric acid that is produced causes corrosion of the drums, resulting in further leaks. See Ex. 1 at 38.

Defendant also contends that plaintiff was negligent in stowing the container on deck on the starboard side. It claims that since an ocean carrier is obliged to know the special characteristics of its cargo, plaintiff was negligent in stowing in this manner a chemical which is dangerous when exposed to water. Plaintiff responds that the stowage of the container on the No. 4 hatch was proper and in accordance with the C.F.R. requirement that hazardous materials be stowed "in a manner that will facilitate inspection during the voyage, its removal from a potentially dangerous situation, and the removal of packages in case of fire." 49 C.F.R. § 176.69(a). Defendant points out that plaintiff may have violated 49 C.F.R. § 176.69(a) by placing a container on top of this container, and in stowing it on a hatch which was not equipped with a derrick to move containers. Ex. 5 at 10. This is an issue we need not consider here.

■ I find that the stowage of the container on deck was not negligent, nor was it the proximate cause of the accident. It is not generally unreasonable to stow a container on the deck of a vessel equipped for such stowage. See generally, Du Pont de Nemours International, S.A. v. S.S. MORMACVEGA, 367 F.Supp. 793, 798–800 (S.D. N.Y. 1972), aff'd. 493 F.2d 97 (2d Cir. 1974). Even if the location resulted in greater exposure to waves, the effect of the placement relates to the quantum of damages and not to the existence of liability. Once a leak occurred, some damage was inevitable. Mere water vapor in the air, present in a container, causes the kind of chemical reaction that took place here. Ex. 1 at 40. In the absence of a leak, the location of the container would be of no significance. Mr. Van Bedaf testified that if the drums and stowage in the container are in 100% condition, one could expose the container to water and nothing would happen.

■ I find that there is nothing in the record to support defendant's contention that the failure of plaintiff to have the lashing on the container inspected caused the accident. The purpose of checking the lashing is to make sure that the containers do not shift. Captain David C. Crane, an employee of National Cargo Bureau, Inc., checked the stowage on the ship. He did not inspect the lashing on the containers on the No. 4 hatch because they had not yet been loaded when he finished his inspection. Ex. 6 at 31. He did go over the lashing plan for these containers. Ex. 7 at 48. Whether or not it would have been a better practice to have had him check the lashings, the testimony establishes that in fact at the

end of the voyage, the container had not shifted from its original position. Ex. 2 at 5–6, 37–38.

Defendant's contention that plaintiff committed an unreasonable deviation within the meaning of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(4) by stopping in Baltimore, Maryland and Wilmington, North Carolina after lifting defendant's container in Newark, and before departing for Rotterdam, is without merit. The bill of lading includes, under the heading "The Scope of Voyage," the following statement:

"The contract is for liner service and the voyage herein undertaken shall include usual or customary or advertised ports of call whether named in this contract or not, also ports in or out of the advertised, geographical, usual or ordinary route or order, even though in proceeding thereto the vessel may sail beyond the port of discharge or in a direction contrary thereto, or depart from the direct or customary route." Ex. 4K.

Piotr Swinder, plaintiff's Port Captain, testified that the ship's normal schedule was to go from Newark to Baltimore to Wilmington. Trial Tr. at 59. James Burke, Vice President of Gydnia–American Line, the General Agent in the United States for Polish Ocean Line, confirmed that this was the ship's normal schedule, but conceded that on occasion, because of weather conditions, the ship would not make all these stops. Trial Tr. at 141.

■ I find that the M/V FRANCISZEK ZUBRZYCKI followed her customary course and therefore did not engage in a deviation. Defendant is bound by the express terms of the bill of lading on this point.

■ Defendant raises the possibility that plaintiff was negligent in not promptly jettisoning the container when it first developed problems, and in its restowing of the drums. These points relate to the duty of plaintiff with respect to possible mitigation of damages and have no bearing on the question of liability. The contention that extra water entered the container after it was restowed by the plaintiff similarly will be considered at the time damages are assessed.

■ I refuse to adopt defendant's various charges of falsification and therefore need not apply the rule of *falsus in uno, falsus in omnibus*. Defendant accuses the Master and Chief Mate of stating falsely that the drums were not fastened at all. Only seven drums were fastened, and, as the diagram of the stowage plan demonstrates, these seven drums were in the rear of the container. There is some evidence suggesting that these witnesses entered the front of the container. See Ex. 7N at 2. This is consistent with the description that when the container was opened, the containers in the front were the ones which were thrown overboard. These were unsecured drums. Defendant, in its brief, says that the end which was opened had the secured drums, but fails then to give a coherent explanation as to which drums were thrown overboard. In any case, the conditions at the time the container was opened were dangerous, and it is understandable that these witnesses might have overlooked the steel straps.

Defendant also makes the accusation that the plaintiff alleged falsely in its complaint that it had not been put on notice that the cargo was dangerous. Plaintiff did not press this claim in any of its post–trial briefs. The evidence shows that the plaintiff was aware that the drums contained corrosive chemicals. The dock receipt, Ex. 4E, and bill of lading, Ex. 4K, were so labeled, the container had a sign on it marked "corrosive," Ex. 3D. Also, the container was entered on the plaintiff's dangerous cargo manifest, Ex. 7J. The fact that a party is unable to prove an allegation at trial is not the grievous falsehood defendant would have this Court find.

Plaintiff's second cause of action alleges that defendant breached its express and implied warranties to plaintiff.

■ Plaintiff cites R. R. Russel's certification on the dock receipt to the effect that the drums were stowed in accordance with

regulation as an express warranty to the plaintiff that the drums were properly stowed. I agree with this contention and find that defendant was in breach of its warranty.

Plaintiff urges that the defendant also gave an implied warranty to it that the stowage was fit for shipment by undertaking to load, stow, and pack the house to house container. Having found an express warranty, there is no need to consider the existence of an implied warranty.

Defendant agreed by contract to indemnify the vessel for the consequences of poor stowage. Clause 7g of the bill of lading states:

"Should the goods be refused exportation or importation by any government or authority or by anybody purporting to act with the authority of any government or authority or should the goods in the Carrier's opinion be in such condition that he considers it advisable to discharge, transship, return, remove or destroy them, then he shall be entitled to do so at any port or place. In such case the Merchant shall bear the risk for the goods and the costs directly or indirectly incurred." Ex. 4K.

Clause 16e states:

"The Merchant shall be liable for all fines and/or losses which the carrier, vessel or cargo may incur in connection with the cargo through non-observance of Custom House and/or import or export regulations." Ex. 4K.

The dock receipt provides that the bill of lading and dock receipt "shall constitute the contract under which the goods are received...."

Again, as this decision deals only with the question of liability, the measurement of damages arising out of the breach of these contractual provisions will be decided at a later time.

I find that defendant's negligence in connection with the stowage of the container was the proximate cause of damage to plaintiff, rendering defendant liable therefor under a theory of negligence, as well as by virtue of defendant's breach of contract and express warranty.

The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52, F.R.Civ.P. Settle an interlocutory Judgment on ten (10) days notice.