Emil ASLANIDIS, Plaintiff–Appellant,

v.

UNITED STATES LINES, INC., United States Lines (S.A.), Inc., United States Lines, Inc., Reorganization Trust, United States Lines (S.A.), Inc., Reorganization Trust, Defendants–Appellees.

Emil ASLANIDIS, Plaintiff–Appellant,

v.

BRANDEIS INTSEL & CO., INC., Brandeis Division of Pechiney World Trade USA, Inc., John Doe I, John Doe II, John Doe III, Samancor, Ltd., South African Container Depots, Ltd. and Rennies Freight Services, Ltd., Defendants–Appellees.

BRANDEIS INTSEL & CO., INC. and Brandeis Division of Pechiney World Trade USA, Inc., Third–Party–Plaintiffs,

v.

SAMANCOR, LTD., South African Container Depots, Ltd. and Rennies Freight Services, Ltd., Third–Party–Defendants.

Nos. 1405, 1677, Dockets 92–9265, 92–9263.

United States Court of Appeals, Second Circuit.

Argued June 14, 1993.

Decided Sept. 27, 1993.

Francis J. Dooley, Orange, NJ, for plaintiff-appellant.

Nancy J. Heller, New York City (Morris Stern, Stern, Dubrow & Marcus, New York City and Maplewood, NJ, of counsel), for defendants-appellees U.S. Lines, Inc., U.S. Lines (S.A.), Inc. and U.S. Lines, Inc. and U.S. Lines (S.A.), Inc. Reorganization Trust.

John J. Wrenn, Brooklyn, NY, for defendant-appellee Brandeis Intsel & Co., Inc.

John R. Foster, New York City (Waesche, Sheinbaum & O'Regan, P.C., of counsel), for defendant-appellee Samancor, Ltd.

Peter J. Zambito, New York City (Dougherty, Ryan, Giuffra, Zambito & Barra, of counsel), for defendants-appellees South African Container Depots, Ltd., and Rennies Freight Services, Ltd.

Before: CARDAMONE and MAHONEY, Circuit Judges, and PARKER, District Judge.*

CARDAMONE, Circuit Judge:

Emil Aslanidis appeals from twin October 20, 1992 judgments of the United States District Court for the Southern District of New York (Kram, J.), dismissing his claims against defendants in two related suits arising from a toxic fire that occurred aboard an American vessel sailing on the high seas. Aslanidis, a merchant seaman working on the vessel, was injured by the fumes. He alleges the district court wrongly granted summary judgment to the owner of the ship in one suit, and in favor of the manufacturer, packager, transporter and purchaser of the cargo that caught fire in the other.

With respect to the first cause of action, when the ship's owner declared bankruptcy, plaintiff petitioned for relief from the automatic stay, wrongly thinking that time was on his side. But, in so doing, he became the clock-setter; so that when he later sued the owner of the ship, time had run out and his claim was barred by the statute of limitations. Time limitations similarly barred Aslanidis' second suit. Although his intent to sue the manufacturer—and the other defendants that had charge of the flammable phosphorus—was properly conceived in the womb of time, notice of it to them was too long

---

* Honorable Fred I. Parker, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

delayed in delivery. Hence, we affirm both judgments.

## BACKGROUND

### A. *The Phosphorus Fire*

In 1985 Aslanidis was employed as a seaman aboard the S.S. American Rigel (RIGEL), a container vessel owned and operated by United States Lines, Inc. (U.S. Lines). In April of that year, the RIGEL commenced a scheduled three-month voyage from its home port in New York City to South Africa and then to South America before returning. Upon arrival in South Africa, the RIGEL loaded a sea container holding 76 steel drums of phosphorus, a highly flammable chemical element, which must be transported in a water blanket to keep it from coming into contact with the air. Phosphorus exposed to air ignites spontaneously.

The phosphorus on the RIGEL was manufactured by Samancor, Ltd. of South Africa; it had been sold to Brandeis Intsel Africa "free-on-board," which company in turn sold the shipment to Brandeis Intsel Ltd., London (Brandeis London) "free-on-board." Brandeis London then sold the shipment to Brandeis Intsel & Co. (Brandeis New York) "cost-insurance-freight (CIF) New York." During these paper transactions, Samancor had kept the phosphorus drums in its South Africa plant stowed in a sea container supplied by U.S. Lines. When the paperwork was completed, the manufacturer arranged with Rennies Freight Services, Ltd. (Rennies) to carry the sea container from its factory to the Durban, South Africa docks for loading on the RIGEL.

On April 30, 1985 while the phosphorus shipment was en route to Durban, it was damaged in a motor vehicle accident. Upon learning of the accident, Samancor obtained a replacement sea container from U.S. Lines and contracted with South African Container Depots, Ltd. (SACD) to transfer all 76 drums of phosphorus from the damaged receptacle into the new one. Samancor instructed SACD that the phosphorus needed to be kept under water. The restowing was done carelessly, some of the nails that were hammered into supports within the sea container pierced four of the phosphorus drums and its surrounding water shield, causing the container's liquid blanket to commence leaking.

At Samancor's direction, Rennies transported the new container to the port at Durban, where it was loaded on the RIGEL for transport to the United States. On May 22, 1985 while the merchant vessel was in the South Atlantic off the coast of Brazil, the water blanket deflated and phosphorus from the four damaged drums made contact with the air and self-ignited. The resulting fire was quickly extinguished by the ship's crew, but toxic fumes emitted from the smoldering container had been released. Aslanidis alleges in his complaint that these fumes injured him and seven other RIGEL crew members.

Following the fire, the RIGEL was diverted to Salvadore, Brazil, where its cargo was off-loaded and examined. The 72 undamaged drums of phosphorus were restowed in another container and returned to the ship for its continuing voyage to New York; the four damaged drums were jettisoned at sea. On June 6, 1985 the RIGEL arrived at the Howland Hook Marine Terminal in Staten Island, New York, where the phosphorus-bearing container was stripped by personnel from the New York City Fire Department, U.S. Lines, and its insurers. An ensuing investigation found several of the drums to be leaking, but determined that the chemical material inside was sound. Nevertheless, Brandeis New York indicated it would not accept the shipment, and Samancor agreed to take back the damaged cargo and replace it with conforming goods.

### B. *Proceedings Below*

#### 1. Action Against U.S. Lines

After the May 1985 fire, plaintiff Aslanidis attempted to file suit against U.S. Lines but was prevented from doing so because on November 24, 1986 the owner of the RIGEL and its parent company sought bankruptcy protection in the Southern District of New York and were granted an automatic stay of all claims under 11 U.S.C. § 362 (1988). As a result, Aslanidis petitioned the Southern District Bankruptcy Court (Blackshear, J.) pursuant to 11 U.S.C. § 108(c) (1988) for

limited relief from the stay. On November 27, 1991 the bankruptcy court granted Aslanidis such relief, permitting him to pursue the instant claim.

On January 24, 1992—58 days after the bankruptcy court's action—Aslanidis commenced suit against U.S. Lines under general maritime law and the Jones Act, 46 U.S.C.App. § 688 (1988), in the Southern District of New York. In his complaint Aslanidis alleged that U.S. Lines was negligent in its handling of the phosphorus cargo, breached the warranty of seaworthiness of the RIGEL, and violated its duty of maintenance and cure while its employee seaman was unfit for duty. U.S. Lines responded by moving for dismissal of the complaint under Fed.R.Civ.P. 12(b)(6), or in the alternative, for summary judgment under Fed.R.Civ.P. 56 because Aslanidis' action was barred under the three-year statutes of limitations found in the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C.App. § 763a (1988), and the Jones Act. Aslanidis countered that these applicable time bars were "tolled" or suspended while U.S. Lines was protected by the automatic stay provision of the Bankruptcy Code.

In an order dated October 16, 1992 Judge Kram granted U.S. Lines' motion for summary judgment. In so doing, she held the bankruptcy court's stay did *not* toll the two maritime statutes of limitations. According to the district court, Aslanidis was required to commence his action within three years of the date of his alleged injury, or within 30 days of the lifting of the automatic stay under the Bankruptcy Code. Aslanidis' January 24, 1992 complaint—filed over six years after the ship fire and 58 days after the lifting of the bankruptcy stay—was not timely under either measure and, accordingly, it granted the motion terminating Aslanidis' action against U.S. Lines.

### 2. Action Against the Other Parties

Meanwhile, Aslanidis had filed a separate complaint on May 23, 1988 in the United States District Court for the District of New Jersey, against various parties—other than U.S. Lines—that had handled the phosphorus. Aslanidis alleged they were negligent and reckless and thus liable for the injuries he incurred as a result of the May 22, 1985 fire on the RIGEL. In this complaint, Aslanidis named as defendants Brandeis New York, Union Carbide Corp. (which by consent order was subsequently released from the action), and three "John Does." Aslanidis maintains he employed the "John Doe" pleading because he was unable to ascertain the names of the other defendants involved in the transportation and packaging of the phosphorus.

Following January 1990 discovery, Brandeis New York filed a third-party complaint against the phosphorus manufacturer, Samancor, and the South African transporters and repackagers, Rennies and SACD. Brandeis New York's pleading apparently alerted Aslanidis to the identities of the parties that had handled the sea container, and on May 25, 1990, he amended his complaint to substitute Rennies, SACD, and Samancor for the "John Does." These three new defendants were served by mail in June 1990. All four replied to Aslanidis' amended complaint with motions to dismiss this complaint, which in June 1990 had been transferred from the District of New Jersey to the Southern District of New York pursuant to 28 U.S.C. § 1404(a) (1988).

On October 16, 1992 Judge Kram issued an opinion and order granting defendants' motions in this other action. She granted Rennies' and SACD's motion to dismiss Aslanidis' complaint pursuant to Fed.R.Civ.P. 12(b)(5) and (6) because she found plaintiff had failed to demonstrate *in personam* jurisdiction over either South African defendant. She also granted summary judgment to Rennies, SACD, and Samancor under Fed.R.Civ.P. 56 because defendants had been served with the amended complaint five years after the fire and the alleged injury—well beyond the expiration of the three-year maritime statute of limitations. *See* 46 U.S.C.App. § 763a. The district court further found that Brandeis New York, as the consignee, could not reasonably have been expected to know whether the goods in question were loaded in a proper manner and thus could not be held liable. Accordingly, it

also granted Brandeis New York's motion for summary judgment.

On October 20, 1992 the district court handed down two final judgments terminating plaintiff's cases against both U.S. Lines and the other defendants. Aslanidis appeals from both final judgments, raising objections as to each of the district court's rulings. In the interest of judicial economy, we consider both of Aslanidis' appeals together.

## DISCUSSION

### I Summary Judgment

■ We review *de novo* the district court's grant of summary judgment to defendants. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 146 (2d Cir.1993). Summary disposition is appropriate when all the papers before a trial court show that there are *no genuine issues of material fact.* Fed. R.Civ.P. 56(c). A litigant seeking such relief bears the initial burden of demonstrating the absence of any genuine factual issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once this burden is met, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists. To do so successfully, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts, ... [it] must come forward with 'specific facts showing that there is a *genuine issue for trial.'* " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

■ Our role is to determine whether the district court correctly concluded that there were no genuine issues for trial as to Aslanidis' claims, thereby entitling the appellees to "judgment as a matter of law." *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). In carrying out this task, we view the evidence in a light most favorable to appellant, the non-moving party, and draw all reasonable inferences in his favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82

S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam).

### II Tolling the Maritime Statutes of Limitations

Appellant initially asserts that the district court erred in granting U.S. Lines' motion for summary judgment on the grounds that the seaman's cause of action against the shipping company was barred by the three-year maritime statutes of limitations. He contends the limitations periods found in the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C.App. § 763a, and the Jones Act, 46 U.S.C.App. § 688, were tolled while U.S. Lines was under protection of the bankruptcy court stay. Since 18 months remained under the time bars—within which he was required to commence his personal injury action—when U.S. Lines initially entered bankruptcy protection, appellant posits that this period continued to be available to him to file his claim *after* the bankruptcy stay was lifted.

Aslanidis' argument is predicated in large part on his reading of the "Extension of Time" provision of the Bankruptcy Code, 11 U.S.C. § 108(c), which he believes provides for tolling of all externally imposed statutes of limitations while a debtor is in bankruptcy. This code section states, in pertinent part:

> [I]f applicable nonbankruptcy law ... fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor ... and such period has *not* expired before the date of the filing of the petition, then such period does not expire until the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 30 days after notice of termination or expiration of the stay under section 362....

11 U.S.C. § 108(c) (emphasis added).

■ Analysis of this provision must commence with the language of the statute itself because, when looking at its language, a court should presume that the statute says what it means. *See Connecticut Nat'l Bank*

*v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). If the words of a statute are unambiguous, judicial inquiry should end, and the law interpreted according to the plain meaning of its words. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202, 4 L.Ed. 529 (1819) (Marshall, Ch.J.). Only where doubt or ambiguity resides in a Congressional enactment—*i.e.,* the legislature's finished product—may legislative history and other tools of interpretation beyond a plain reading of the statute's words be utilized to shed light on verbiage that is unclear. *See, e.g., SEC v. Robert Collier & Co.,* 76 F.2d 939, 940–41 (2d Cir. 1935) (L. Hand, J.).

 Commencing with the plain meaning, we observe that by its terms § 108(c) does not provide for tolling of any externally imposed time bars, such as those found in the two maritime statutes of limitations. The bankruptcy section only calls for applicable time deadlines to be extended for 30 days after notice of the termination of a bankruptcy stay, if any such deadline would have fallen on an earlier date. The reference in § 108(c)(1) to "suspension" of time limits clearly does not operate in itself to stop the running of a statute of limitations; rather, this language merely incorporates suspensions of deadlines that are expressly provided in *other* federal or state statutes.

Any ambiguity with respect to this "suspension" reference in § 108(c)(1) is cleared up by examining the provision's legislative history. This history makes evident that § 108(c)(1) refers to only "special suspensions" that are found in non-bankruptcy provisions such as the Internal Revenue Code. 124 Cong.Rec. H11,109 (daily ed. Sept. 28, 1978); *accord* 2 Lawrence P. King, *Collier on Bankruptcy* ¶ 108.04 (15th ed. 1993); *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 318, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6275.

Our reading of the plain language and legislative history is buttressed by examining how other courts have treated this section of the code. We note that in *Grotting v. Hudson Shipbuilders, Inc.,* 85 B.R. 568, 569 (W.D.Wash.1988), the district court faced a question quite similar to the one presented here and flatly rejected a plaintiff's argument that the three-year time limit found in the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C.App. § 763a, was tolled by 11 U.S.C. § 108(c). In so doing, the district court noted that if Congress had intended for § 108(c) to operate as a tolling provision it would have expressly provided for such a suspension of time limits, as it had in a predecessor to § 108. *Id.* at 570. The court reasoned that Congress did not plan for such tolling because tolling the limitations period would not comport with the fair administration and expeditious handling of a bankrupt's estate: "parties have more certain knowledge of when claims will expire, and the potential claims period is not unduly extended because of the length—which may be great in complex cases—of the bankruptcy proceedings." *Id.* Similarly, in *In re Baird,* 63 B.R. 60 (Bankr.W.D.Ky.1986), a bankruptcy court rejected an argument that § 108(c) by itself suspended a state statute of limitations because such suspension was not compatible with the legislative history of the Bankruptcy Code provision. *Id.* at 62.

Aslanidis argues for an alternative interpretation of § 108(c), citing for support our decision in *In re Morton,* 866 F.2d 561 (2d Cir.1989). *Morton* concerned the validity of a bank judgment lien on a bankruptcy debtor's residential property. The debtor argued that the lien—which had a ten-year life under New York State law—had expired while she was in bankruptcy. The bank raised several points to the contrary, including the argument that 11 U.S.C. § 108(c) preserved the lien beyond the 10-year period. We accepted the lienholder's position and held "that § 108(c) . . . tolls New York's ten-year period *until the automatic stay is terminated.*" *Id.* at 565 (emphasis added).

Aslanidis contends that this and other similar language in *Morton* compels us to rule that § 108(c) operates to toll the maritime time bars and to reverse the district court's grant of summary judgment. This proposition is more beguiling when initially encountered than it is after a longer acquaintance; that is, while at first glance our holding in *Morton* would seem on point, careful analysis

reveals it is not. In the first place, *Morton* only addresses what happens *during* the period when a bankruptcy stay is in effect, not the period after the stay has been terminated or otherwise removed, which is the situation in Aslanidis' case. *See id.* at 566. Second, the plaintiff bank in *Morton* believed that it should have only 30 days after the stay was lifted to renew its lien; the bank did not contend, as appellant does here, for tolling beyond this 30–day grace period. *See id.* at 566 ("bank argues that [the ten-year time bar] was suspended ... so that, under subsection (2) of § 108(c) the bank *will have 30 days after the automatic stay is terminated*. *to enforce* its claim") (emphasis added). Accordingly, the holding in *Morton* is inapposite to the instant dispute, and Aslanidis may take no comfort from it.

Appellant also insists that *McKinney v. Waterman S.S. Corp.*, 739 F.Supp. 678 (D.Mass.1990), *aff'd*, 925 F.2d 1 (1st Cir. 1991), supports his view that § 108(c) tolls the statutes of limitations. Aslanidis points out that the district court in *McKinney* inferred that the time clock for beginning a maritime law suit was suspended while a defendant was in bankruptcy, and began running again only when the bankruptcy stay was lifted. *See id.* at 682. We decline to follow this decision. *McKinney*'s statements about tolling are *dicta*, for the court there actually held that whether or not the statute of limitations was suspended, the plaintiff's case was time barred because he had "overslept his rights after the stay was lifted." *Id.* at· 683.

Appellant next asserts the Jones Act, 46 U.S.C.App. § 688, and the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C.App. § 763a, provide independent bases for suspending the normally applicable three-year limitations period while a debtor is in bankruptcy. He asserts these statutes are "special suspension" laws, referenced in 11 U.S.C. § 108(c)(1). To this end, Aslanidis notes that the Jones Act limitations period— which is borrowed from the Federal Employers' Liability Act (FELA), 45 U.S.C. § 56 (1988), *see Engel v. Davenport*, 271 U.S. 33, 38–39, 46 S.Ct. 410, 412, 70 L.Ed. 813 (1926)—has not been found "totally inflexi-

ble" but has instead been extended beyond three years where "a plaintiff has not slept on his rights but, rather, has been prevented from asserting them." *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 429, 85 S.Ct. 1050, 1055, 13 L.Ed.2d 941 (1965). Appellant insists such a time extension is warranted in the instant action because U.S. Lines' bankruptcy stay prevented him from exercising his rights.

■■ Although Aslanidis cites a number of cases brought under FELA and the Jones Act in which the statutes of limitations have been tolled, he points to no cases that suspend the applicable three-year statutory period during pendency of bankruptcy. Statutes of limitations are designed to ensure fairness to defendants and to prevent surprises brought about by the attempt to breathe life into causes that have lain dormant for so long that proof, witnesses and memories all, have disappeared. *See Burnett*, 380 U.S. at 428, 85 S.Ct. at 1054; *Order of R.R. Tel. v. Railway Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). As appellant notes, these policies must on occasion give way so as to permit vindication of a plaintiff's rights, and tolling may be appropriate where particular external forces beyond a claimant's power to control disable plaintiff from suing. *See, e.g., Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 235, 79 S.Ct. 760, 763, 3 L.Ed.2d 770 (1959); *Osbourne v. United States*, 164 F.2d 767, 768–69 (2d Cir.1947). But such a tolling rationale does not apply in the bankruptcy arena because plaintiffs have advance knowledge of when claims are to expire and may act to protect themselves. *See In re Pettibone Corp.*, 110 B.R. 848, 855– 57 (Bankr.N.D.Ill.), *aff'd sub nom. Pettibone Corp. v. Baker*, 119 B.R. 603 (N.D.Ill.1990), *rev'd and remanded on other grounds sub nom. Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir.1991); *see also Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 912 & n. 6 (6th Cir.1993).

Such was the case here. Aslanidis was not caught off-guard when the 30–day limitations period began to run; rather, by applying to the bankruptcy court for a waiver of the stay, he himself set that clock ticking. It is thus

not correct for him to declare that he was "prevented" from exercising his rights. The current scenario, though an unfortunate one for plaintiff, provides no basis for tolling the applicable time limits.

■ Making one further point, Aslanidis maintains that equitable principles commend the tolling of the two three-year maritime statutes of limitations. He asserts these deadlines should be extended because he was misled by the actions of U.S. Lines and its insurer, and that those misrepresentations prevented him from suing defendants timely. *Cf. Glus*, 359 U.S. at 235, 79 S.Ct. at 763 (tolling the FELA time bar where defendant misled plaintiff about the time available within which to file suit). Yet, aside from rather vague and general references to appellee's alleged misdeeds, Aslanidis has failed to advance any credible proof of wrongful actions on the part of this appellee or its insurance company. A party asserting equitable estoppel must demonstrate that it is warranted, *see McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 6 (1st Cir.1990); *see also Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 66–67 (2d Cir.1963) (Friendly, J.), and to avoid summary judgment on this issue must do more than show that some metaphysical doubt exists regarding the material facts. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. Since appellant failed to meet this standard, summary judgment to U.S. Lines was properly granted.

## III Relation Back and Fed.R.Civ.P. 15(c)

We turn now to Aslanidis' other appeal. On May 23, 1988 Aslanidis timely sued Brandeis New York, Union Carbide, and three "John Does." Two years later, in May, 1990, he amended his complaint by naming Samancor, SACD, and Rennies as defendants in lieu of the "John Does." It is conceded that by the time the amended complaint was filed and the new defendants were served, the three-year limitations period set out in Uniform Statute of Limitations for Maritime Torts had expired. Appellant contends in this second suit that the amended complaint naming the three South African parties was not barred by the statute of limitations because it relates back to the time of the original "John Doe" pleading.

■ It is familiar law that "John Doe" pleadings cannot be used to circumvent statutes of limitations, *see Talbert v. Kelly*, 799 F.2d 62, 66 n. 1 (3d Cir.1986); *Wood v. Worachek*, 618 F.2d 1225, 1229 (7th Cir.1980), because replacing a "John Doe" with a named party in effect constitutes a change in the party sued. *See Varlack v. SWC Caribbean, Inc.*, 550 F.2d 171, 174 (3d Cir.1977); *accord Britt v. Arvanitis*, 590 F.2d 57, 60–62 (3d Cir.1978). Such an amendment may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met. *See Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1226–27 (10th Cir.1991); *see also Juzwin v. Asbestos Corp., Ltd.*, 900 F.2d 686, 690 n. 4 (3d Cir.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990).

Rule 15(c), applicable at the time of the filing of the amended complaint, stated:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c) (amended Dec. 1, 1991). In *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), the Supreme Court read this rule as establishing four requirements in order for an amended complaint to relate back to the original complaint. Each of the following conditions must be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) "the party to be brought in must have re-

ceived such notice that it will not be prejudiced in maintaining its defense"; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria must have been fulfilled within the established limitations period. *Id.* at 29, 106 S.Ct. at 2384.

Changes in the wording of the rule—designed to avoid the outcome under *Schiavone*—now provide a slightly revised standard for amendments. Under the revised rule an amended complaint relates back to the time of the original if the new party was aware of the action within 120 days of the filing of the original complaint. *See Worthington v. Wilson,* 790 F.Supp. 829, 833 (C.D.Ill.1992). As amended, Fed.R.Civ.P. 15(c) continues to retain the old *Schiavone* requirements that a new party (1) receive adequate notice of an action so as not to be prejudiced in maintaining a defense, and (2) knew or should have known that the action would have been brought against it earlier but for a mistake of identity. *See* 3 James W. Moore & Richard D. Freer, *Moore's Federal Practice* ¶ 15.15[4.–2], at 161 (2d ed. 1993).

█ The district court properly applied the version of Rule 15(c) in effect during the relevant time period. It found Aslanidis had failed to fulfill the second and third factors of the *Schiavone* test, and appellant has presented no evidence that this determination was clearly erroneous. Under the second factor, Aslanidis has not shown that Samancor, SACD, and Rennies had received notice of the instant action prior to the service of process on them in June, 1990, well after the expiration of the limitations period. Nor has appellant demonstrated under the third factor that these parties knew that they were intended to be sued and would have been but for a mistake in their identity.

Aslanidis insists these defendants were aware of the phosphorus accident a few days after its occurrence. But accepting as true this hotly contested assertion does not save appellant's claim, for Rule 15(c) and the Supreme Court's test in *Schiavone* require notice of plaintiff's cause of action, not simply notice of the accident. *See* 6A Charles A. Wright et al., *Federal Practice & Procedure* § 1498, at 125 (2d ed. 1990); *see also Honeycutt v. Long,* 861 F.2d 1346, 1350–51 (5th Cir.1988) (looking to whether party had sufficient notice of federal law suit); *Worachek,* 618 F.2d at 1229–30 (same). And, even if the rule is interpreted to call for notice of the accident rather than the suit, Aslanidis has failed to satisfy the further requirement of the second *Schiavone* factor that the notice be such that the defendants will not be prejudiced in their ability to maintain a defense on the merits.

The alternative equitable tolling of the limitations period and equitable estoppel arguments appellant additionally included are of insufficient merit to warrant discussion. Thus, summary judgment was properly granted to SACD, Rennies, and Samancor, and there is therefore no need to determine whether the district court also correctly dismissed SACD and Rennies from this litigation due to a lack of personal jurisdiction over them.

## IV Responsibility of a Consignee

Aslanidis maintains finally it was error to hold that Brandeis New York, as the consignee of the phosphorus, was not liable to him as a matter of law. According to appellant, Brandeis New York was owner of the phosphorus when it caught fire because title and risk of loss to the goods had passed to it under the terms of the "cost-insurance-freight" (CIF) contract. As owner of the cargo, so appellant's argument runs, Brandeis New York became liable for all the damage and injuries caused by the combustion of the exposed drums.

█ Accepting as true this disputed contention that Brandeis New York held title to the goods at the time of the fire will not impose liability on it as the consignee. Aslanidis posits that Brandeis New York as the phosphorus owner should be liable, for example, under a theory of negligence. Yet, plaintiff points to no act or omission on the part of Brandeis New York that was negligent. The consignee had no involvement with the packaging of the 76 steel drums, and it had no contract with the entities that stowed the

goods. In such case, imposing liability on the purchaser of goods would be both unjustified and illogical. *Cf. Rector v. General Motors Corp.*, 963 F.2d 144, 147 (6th Cir. 1992) (finding consignee not liable because it could not "reasonably be expected to know whether the goods were loaded in a safe or reasonable manner prior to shipping").

Aslanidis asserts that liability may be imposed under the rationale employed in *Poliskie Line Oceaniczne v. Hooker Chem. Corp.*, 499 F.Supp. 94 (S.D.N.Y.1980), which he refers to as a strikingly similar case. There, a container of sulphur dichloride belonging to Hooker Chemical leaked while on board a ship in the North Atlantic, resulting in injury to the ship's crew and damage to the vessel. The district court held the chemical company liable for the damages caused by its negligent stowage of the chemical in the sea container. *See id.* at 102. Under these facts *Poliskie* is quite distinguishable. Hooker Chemical, unlike Brandeis New York, was the party actually responsible for the shipping and packaging of the container and was found liable for its *own* acts and omissions. *Poliskie* thus cannot stand for the proposition advanced by Aslanidis: that a consignee, by virtue of that status alone, is responsible for injuries and damages caused by a third party's mishandling of goods. In fact, the consignee of the sulphur dioxide—who stood in the same position as Brandeis New York does here—was not named as a defendant in *Poliskie*.

More analogous to the case at hand is *Di Gregorio v. N.V. Stoomvaart Maatschappij "Nederland"*, 411 F.Supp. 331, 335 (S.D.N.Y. 1975), *aff'd*, 531 F.2d 1143 (2d Cir.1976) (per curiam), in which the district court overturned the jury's finding of negligence on the part of the GTE Company. GTE had purchased four crates of antennas and mountings from Ainslie Antenna Co., Ltd. of Montreal and was shipping them to a purchaser in Saudi Arabia. While the crates were being loaded on a vessel in Brooklyn, New York, the top of one of the crates collapsed, injuring a longshoreman. The district court thought Ainslie was properly found negligent in its packaging of the antennas but determined that such negligence could not be attributed to GTE because "[a] buyer normally has no duty under the law to supervise the seller in the process of producing or packing the purchased goods." *Id.* at 335. As a consequence, the trial court decided—and we agreed—that imposing liability on GTE would be an inappropriate "interference with normal and sound commercial practice." *Id.* at 335. This reasoning applies here. Hence, summary judgment was properly granted to Brandeis New York.

Aslanidis has raised additional arguments seeking to hold Brandeis New York liable on theories of strict liability and breach of warranty. As these points were not raised in the trial court they come too late for our consideration since a party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal. *See Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir.1983); *see also Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

## CONCLUSION

We have considered all the other arguments raised by the parties and find discussion unnecessary because they are without merit. Accordingly, for the reasons stated the October 20, 1992 judgments of the district court in each case are affirmed.