UNITED STATES of America, Plaintiff,

v.

M/V SANTA CLARA I, its engines, boilers, machinery, masts, boats, anchors, cables, chains, rigging, tackle, apparel, furniture, capstans, outfit, tools, pumps, pumping and other equipment, etc., in rem,

and

Kyriakopoulos Internacional, S.A.; and Empressa Naviera Santa, S.A.; and Juan Alvarez, in personam, Defendants.

KYRIAKOPOULOS INTERNACIONAL, S.A.; and Empressa Naviera Santa, S.A., Third–Party Plaintiffs,

v.

COMPANIA MINERA EL INDIO; Chemical Specialities, Inc., Degesch de Chile, Ltd; and Degesch America, Inc., Third–Party Defendants.

Civ. A. No. 2:92–0389–18.

United States District Court, D. South Carolina, Charleston Division.

May 8, 1995.

828

Ben A. Hagood, Jr., Charleston, SC, Michael J. Devine, Eileen T. McDonough, Rich-

ard Buckingham, Washington, DC, for plaintiff.

Gordon Schreck, Douglas Muller, Charleston, SC, Brian Starer, Charles B. Anderson, New York City, for defendants.

### ORDER

NORTON, District Judge.

This case involves a relatively small shipment of magnesium phosphide, a relatively large shipment of arsenic trioxide, and a storm at sea. As such, it is both an admiralty and an environmental case involving the M/V SANTA CLARA I. For the reasons set forth in detail below, this court denies the summary judgment motions made by Third Party Plaintiffs and Third Party Defendants.

### I. BACKGROUND

January 3, 1992 was a dark and stormy night off the New Jersey coast. The wind whistled through the rigging of the M/V SANTA CLARA I and she was buffeted about by raging seas. The M/V SANTA CLARA I is a Panamanian flagged 478 foot long multi-purpose cargo vessel owned by Kyriakopoulos Internacional, S.A. and operated by Empressa Naviera Santa, S.A. (hereinafter jointly referred to as "ENS"). On December 2, 1991, the M/V SANTA CLARA I was loaded with a shipment of ten drums of magnesium phosphide in Valparaiso, Chile. The ten drums were secured to five pallets of two drums each and were placed in the # 1 tween deck. The seller of the magnesium phosphide, Degesch de Chile ("Degesch Chile"), hired a freight forwarder A. Hardrodt Chile ("Hardrodt") to prepare the appropriate shipping forms and bills of lading for the magnesium phosphide.[1] Although Degesch Chile labeled the drums of magnesium phosphide as "poison when wet" and paid the hazardous cargo shipping rate to Hardrodt, the bills of lading and the Chilean customs forms prepared by Hardrodt and delivered to the M/V SANTA CLARA I did not designate the cargo as hazardous. The magnesium phosphide was destined for Baltimore where it would be unloaded for ultimate delivery to the consignee purchaser, Degesch America.

After loading the magnesium phosphide in Valparaiso, the M/V SANTA CLARA I continued to Coquimbo, Chile, where on December 3 and 4, 1991, twenty-five shipping containers each holding approximately one hundred eight barrels of arsenic trioxide were loaded onto the ship. Compania Minera El Indio ("El Indio"), the seller of the arsenic trioxide, was responsible for the packing and delivery of the sealed shipping containers to the M/V SANTA CLARA I. Unlike the bills of lading for the magnesium phosphide, the bills of lading for the arsenic trioxide properly declared the cargo as hazardous. Some of the shipping containers were loaded on the deck of the vessel on top of the # 2 hatch. The cargo of arsenic trioxide was also destined for the United States for ultimate delivery to the consignee purchaser, Chemical Specialties, Inc. ("CSI"). CSI is a company located in North Carolina that uses the arsenic trioxide in the manufacture of a wood treatment chemical compound. After loading the arsenic trioxide, the vessel began her northbound voyage stopping in Ecuador prior to transiting the Panama Canal en route the continental United States for port stops in Philadelphia, New Haven, New York, Port Elizabeth, Baltimore, and ultimately Charleston, South Carolina.

On December 29, 1992, while the vessel was in New Haven, a new captain embarked on the M/V SANTA CLARA I. The ship arrived in New York on New Years Eve where she was idle at anchor until January 2, when she docked at Port Elizabeth, New Jersey to load and discharge cargo. On the evening of January 3, at approximately 5:50 p.m., the M/V SANTA CLARA I departed Port Elizabeth for what was intended to be a short overnight transit to her next port of call, Baltimore, Maryland. During the course of that overnight transit, the vessel encountered a storm approximately thirty miles off the coast. According to the affidavits of the crew, the storm caused the vessel to pitch and roll violently for several hours

---

[1] An additional description of the facts surrounding the magnesium phosphide is contained in *United States v. M/V SANTA CLARA I,* 859 F.Supp. 980 (D.S.C.1994). In an earlier order, this court dismissed Hardrodt for lack of personal jurisdiction.

and resulted in damage to the ship and to much of its cargo. Reconstruction of weather data from buoys in the area indicate that the sea heights reached eighteen feet and the winds gusted to fifty knots. When the storm subsided, the crew noticed that twenty-one shipping containers had been lost overboard and much of the cargo had broken loose below decks. Four of the twenty-one containers lost overboard were loaded with the barrels of arsenic trioxide. A fifth container of arsenic trioxide remaining on board was damaged such that some of its barrels fell overboard. The crew determined that approximately 441 barrels of arsenic trioxide had been lost overboard. The vessel also suffered stowage collapse of sundry cargo including the magnesium phosphide.

On arrival in Baltimore, on January 4, 1992, the M/V SANTA CLARA I was immediately boarded by representatives of the United States Coast Guard Marine Safety Office, the Maryland Port Authority Police, and other government agencies. The Coast Guard required the vessel to clean the decks of any arsenic trioxide prior to allowing cargo to be discharged. The Coast Guard supervised the clean up, and ultimately shore side stevedores discharged cargo.

Included in the discharged cargo was the ten drum shipment of magnesium phosphide. There is some dispute as to whether there was any indication to the vessel or its crew that some of the magnesium phosphide had spilled from the drums resulting in a potentially hazardous condition on board the vessel.[2] After the cleanup of the arsenic trioxide and the unloading of the appropriate cargo, the Coast Guard permitted the vessel to depart Baltimore and to continue its voyage to Charleston, South Carolina.

The vessel left Baltimore on January 6, and arrived in Charleston the evening of the next day. On January 8 longshoremen boarded the vessel early in the morning to load and discharge cargo. Additionally, Coast Guard representatives boarded the

M/V SANTA CLARA I to continue to investigate the overboard loss of the shipping containers of arsenic trioxide. While Coast Guard officials were talking with the ship's captain about the loss of the arsenic trioxide, a stevedore reported the existence of fumes and a "garlic-like" smell in the #1 tween deck. A preliminary investigation resulted in the location of a lid from one of the drums of magnesium phosphide that was previously unloaded in Baltimore. The Coast Guard brought the lid to the captain's office in an effort to identify the source of the fumes. Further investigation revealed that approximately 800 pounds of magnesium phosphide had spilled in the hold of the vessel. It was then determined that the fumes were caused by a spontaneous chemical reaction that occurred when the spilled magnesium phosphide reacted with latent moisture thereby creating a dangerous phosphine gas. The captain inspected the documentation associated with his cargo and noted that none of the shipping documents, including the bills of lading, the Chilean custom's forms nor the vessel's Dangerous Cargo Manifest, listed the magnesium phosphide as a hazardous cargo, which in fact it was. The vessel was required to clean up the remaining magnesium phosphide and incurred costs in doing so in addition to expenses related to personal injury claims, cargo damage claims, and government fines. According to ENS, the costs associated with the magnesium phosphide spill amounted to approximately 2.2 million dollars.

As a result of the loss of the arsenic trioxide, the United States in conjunction with ENS began to search for, locate, and recover the arsenic trioxide containers and barrels. Most of the barrels were found in an underwater "debris field" approximately thirty miles off the coast of Cape May, New Jersey. After determining that a removal action was appropriate and receiving authority from the United States Environmental Protection Agency for response action, an Administra-

---

2. The parties disagree with respect to the admissibility and consideration by this court of a Board of Inquiry Report published by the Coast Guard as a result of its investigation into the incidents on board the M/V SANTA CLARA I.

This court does not address the admissibility of that report at this time and has not relied on it in its disposition of these summary judgment motions.

tive Order[3] was issued on February 20, 1992 to Third Party Plaintiffs directing them as the owner and operator of the M/V SANTA CLARA I to retrieve and dispose of the barrels of arsenic trioxide. Under protest, Third Party Plaintiffs carried out the Administrative Order over a period of six weeks successfully recovering approximately 320 barrels from the debris field. Third Party Plaintiffs incurred significant costs and expenses in complying with the Administrative Order and now seek to recover these expenses from El Indio and CSI. According to ENS, the recovery costs amounted to approximately five million dollars.

## II. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. CenTra, Inc.*, 947 F.2d 115, 119 (4th Cir.1991).

## III. SUMMARY JUDGMENT MOTIONS

On December 15, 1994, Third Party Plaintiffs ENS filed a Motion for Summary Judgment against Third Party Defendants El Indio, CSI, Degesch Chile and Degesch America. With respect to the magnesium phos-

phide, Third Party Plaintiff's Motion against Degesch Chile and Degesch America states that ENS was required to spend a considerable amount of money deactivating the magnesium phosphide cargo shipped by Degesch Chile and consigned to Degesch America. ENS asserts that Degesch Chile failed to declare its shipment as hazardous cargo in shipping papers submitted to them and both Degesch Chile and Degesch America are obligated as a matter of law under the express language of the bill of lading to reimburse ENS for these costs.

With respect to the loss and recovery of the arsenic trioxide, Third Party Plaintiffs also rely on the terms of the bill of lading to argue that they are entitled to be indemnified by El Indio and CSI for expenses and costs associated with the clean up and recovery of the arsenic trioxide. Further, Third Party Plaintiffs argue that under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607, either El Indio or CSI was the owner of the arsenic trioxide and therefore a potentially responsible party from which ENS can seek contribution.

The second motion heard by the court is that of Third Party Defendant Degesch America filed on December 27, 1994. In its Motion for Summary Judgment against Third Party Plaintiffs, Degesch America argues that it is a separate corporate entity from Degesch Chile, was not a party to the bill of lading, and as the consignee, was not in any way responsible for the failure of the shipping paperwork to properly identify the magnesium phosphide as hazardous. Also, Degesch America argues that it is cannot be liable as a potentially responsible party under CERCLA for the costs associated with the magnesium phosphide spill.

The third summary judgment motion is that of Third Party Defendant El Indio against Third Party Plaintiffs filed on January 4, 1995. In its cross Motion for Summary Judgment, El Indio also argues that it cannot be liable under CERCLA as a poten-

---

**3.** Administrative/Directive Order issued by the United States Coast Guard to Kyriakopulos [sic] Internacional S.A. and Empressa Naviera Santa

(Feb. 20, 1992) (hereinafter "Administrative Order").

tially responsible party for the costs associated with the recovery of the arsenic trioxide.

## A. The Bill of Lading

### 1. The Magnesium Phosphide

■ Degesch Chile's failure to insure the magnesium phosphide cargo was properly labeled was a breach of the bill of lading; however, this court cannot find as a matter of law that, based exclusively on the terms of the bill of lading, Degesch Chile and Degesch America are strictly liable for all of the damages of ENS associated with the magnesium phosphide spill and cleanup.

At oral argument and in written briefs to the court, Degesch Chile concedes that it failed to properly designate the magnesium phosphide as hazardous cargo.[4] ENS seeks a determination from this court that such error was a direct breach of numerous warranties provided in the bill of lading and under the terms of the bill of lading, Degesch Chile and Degesch America are responsible for the costs incurred by ENS as a result of the spilled magnesium phosphide.

■ A bill of lading is a contract governing the rights of the cargo owner and the shipowner and it is to be interpreted according to the principles of contract law. *See Wemhoener Pressen v. Ceres Marine Terminals Inc.,* 5 F.3d 734, 738 (4th Cir.1993). It is well-recognized that bills of lading are contracts of adhesion and will be construed strictly against the carrier. *Leather's Best, Inc. v. S.S. Mormaclynx,* 313 F.Supp. 1373, 1380 (E.D.N.Y.1970), *aff'd in part, rev'd in part,* 451 F.2d 800 (2d Cir.1971). Further, all contracts of carriage of goods by sea and bills of lading are regulated by the Carriage of Goods by Sea Act, which imposes on the carrier certain duties and rights. 46 U.S.C. app. §§ 1300–1302.

The bill of lading for the magnesium phosphide specifically provided that dangerous cargo must be expressly designated and further addressed additional expenses incurred by the shipper relating to the dangerous cargo. Clause six of the bill of lading stated:

SHIPPER'S WARRANTIES, HAZARDOUS CARGO, STOWAGE. The shipper on its own behalf, and on the behalf of any principal for which he may act as agent or otherwise, represents and warrants that the goods are properly described, marked, secured and packed in containers, vans, trailers, vehicles, palletized units or other packages, and may be handled in ordinary course without damage to the said containers, vans, trailers, vehicles, palletized units or other packages, the vessel, property or persons. The Carrier shall not have any responsibility or liability for the safe and proper packaging or stowage of the contents of the same. **The shipper shall designate any hazardous cargo in the space provided on the reverse herefor.** The shipper shall comply with all of the statutes, ordinances and regulations of the Department of Transportation of the United States of America, Inter–Governmental Maritime Consultative Organization (IMCO) and all other governmental and regulatory bodies with respect to labeling, packaging and preparation of hazardous, flammable, or dangerous cargo for shipment. The shipper agrees to be liable for and to indemnify the Carrier, and all participating carriers, without limitation in amount, and the Carrier shall have a lien on the goods in respect to any losses, detentions, damages, injuries, responsibilities, fines or penalties or expenses arising from inaccuracy of the particulars, or marks, and non-compliance with the warranties, or the regulations as specified above or the improper internal packaging or securing of goods performed by or on behalf of the shipper. **If any goods that are in fact, or are considered by any civil or military authorities or the Master to be flammable, explosive, corrosive, radioactive, noxious, hazardous, or dangerous, whether or not shipped with the knowledge and consent of the Carrier, owner or Master as to their nature and character become a danger to the vessel or other mode of transportation or those aboard, the goods or other property or**

---

4. In reality, this mistake was made by the freight forwarder Hardrodt. *United States v. M/V SAN-*

*TA CLARA I,* 859 F.Supp. at 983.

any part thereof may at any time or place be landed, thrown overboard, destroyed or rendered innocuous without compensation to the shipper or consignee including in general average, and extra charges and expenses, if any for discharging, lightering handling, caring for disposing of or otherwise occasioned by such goods shall be borne by the goods. If in the judgment of the Carrier, owner, Master, or health or other authorities, the goods, whether ashore or afloat are at any time spoiling, decaying and/or being or becoming injurious, offensive, noxious, unfit for further carriage or storage, or dangerous to health or other property, or if such authorities condemn, order the destruction or prohibit the landing of the goods, the goods may, forthwith and without notice be thrown overboard, destroyed, discharged, stored, put ashore or landed at any place or aboard lighters or craft or otherwise disposed of by the carrier, or owner, Master or others, solely at the risk and expense of the goods, at which time the responsibility of the Carrier shall cease, and the Carrier shall not be liable for any loss or damage whatsoever, including in general average. The shipper and its agents shall inspect all containers before loading and the loading of the containers by the shipper and/or its agents shall be prima facie evidence that the containers were sound and suitable for their intended use and sufficient to withstand the rigors of the contracted transportation. It is agreed and understood that the Carrier will rely on the foregoing guarantees, warranties and obligations undertaken by the shipper and its agents when the Carrier enters into any contracts, or engagements with other parties for the performance of all or any part of the transportation provided for in this contract, and the shipper or its agents hereby undertake to indemnify the Carrier for any liability and expense it may incur by reliance thereon.[5]

(emphasis added). The bill of lading further defined the term "goods" in clause one as follows:

> The word "Goods" as used herein shall include the shipper, consignee, receiver, owner and/or holder of the bill of lading.

Based on the above language, ENS argues that Degesch Chile, as the shipper, and Degesch America, as the consignee, are obligated to indemnify ENS for all costs associated with the magnesium phosphide.

It is clear that Degesch Chile failed to comply with government regulations with respect to the labeling of hazardous cargo and in so doing breached its warranty of compliance. The Department of Transportation ("DOT") regulations regarding the shipping of hazardous materials list magnesium phosphide as a hazardous material assigned to packing group I, the most dangerous of three possible packing group categories. *See* 49 C.F.R. § 172.101, at 213 (1993). Further, any shipper of a hazardous material is required to certify that the material is "properly classified, described, packaged, marked and labeled" according to those regulations. *See id.* § 172.204. The failure of Degesch Chile to properly mark the magnesium phosphide as hazardous was a violation of DOT regulations and also a breach of the warranty in the bill of lading.

In spite of the breach of the bill of lading, this court finds that holding Degesch Chile and Degesch America liable for these damages cannot comport with traditional contract law. Although Degesch Chile concedes that it failed to properly label the magnesium phosphide in violation of the terms of the bill of lading, it argues that in order to find it liable for the damages associated with the magnesium phosphide, this court must ultimately determine that the cleanup costs and other associated expenses were "proximately caused" by its failure to properly label the cargo and further that the carrier ENS was not "negligent" in its carriage of the goods. By so arguing, Degesch Chile appears to convert this motion based on breach of con-

---

5. Although this paragraph was contained in clause 6 on the back of the bill of lading, the front of the bill of the lading included a column entitled "HC*" and on the bottom of bill of lading, the reference to the asterisk stated " *Hazardous Cargo, See Clause 6 Hereof."

tract principles into one requiring a more traditional tort analysis.[6]

> [I]t is elementary that in contract theory a party who breaches a contract has its ultimate damage liability for that breach gauged by the test of foreseeability of the injury resulting therefrom. In determining foreseeability questions of "remoteness in time and space and the number of intervening events" are considered to decide whether a breaching party to a contract had reason to foresee the injury. The fact that someone or something else in fact "caused" the injury may or may not in varying situations affect the liability of the breaching party if the party had or should have had reason to foresee that the injury would result....

*Skibs A/S Gylfe v. Hyman–Michaels Co.*, 438 F.2d 803, 808 (6th Cir.) (citing Restatement of Contracts § 330), *cert. denied*, 404 U.S. 831, 92 S.Ct. 73, 30 L.Ed.2d 61 (1971). This court agrees that the correct test to be applied with respect to the bill of lading is whether the damages were in fact foreseeable at the time of the contract considering the remoteness in time and the number of intervening events. *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854).

It is foreseeable that the failure to label cargo as dangerous could result in some type of monetary damage to the ship as a result of that failure; however, this court finds that under the circumstances, the number of intervening events is too many and precludes a finding that Degesch Chile and Degesch America are strictly liable for all damages associated with the magnesium phosphide. *See* 5 *Corbin on Contracts* § 997 (1951 & Supp.1993). The magnesium phosphide was loaded on the ship in Valparaiso, Chile, on December 2, 1991. After departing Valparaiso, the M/V SANTA CLARA I stopped in Coquimbo, Chile and then called on ports in Ecuador prior to transiting the Panama Canal. In the United States, the vessel stopped in Philadelphia, New Haven, New York and Port Elizabeth. It departed Port Elizabeth on the evening of January 3, 1992 en route

for Baltimore when it encountered the violent storm offshore. In Baltimore, the drums of magnesium phosphide were unloaded from the ship and apparently the spill of magnesium phosphide was not discovered or its dangerous nature was not recognized. By January 6, the vessel departed Baltimore and arrived in Charleston the next day. On January 8, some of the approximately 800 pounds of spilled magnesium phosphide reacted with moisture causing the release of phosphine gas. More than a month after the cargo was loaded without the proper certification on the bills of lading, after numerous port stops, a violent storm, and the drums containing the magnesium phosphide having been handled by numerous parties and ultimately unloaded in Baltimore, this court cannot say as a matter of law that Degesch Chile or Degesch America should be held liable for damages associated with the spilled magnesium phosphide. The large number of intervening events alone preclude a finding of liability based solely on the breach of the bill of lading. Therefore, ENS's Motion for Summary Judgment against Degesch Chile and Degesch America is denied.

■ Even if these damages were foreseeable, clauses in a bill of lading that violate public policy or the duties set forth in COGSA are rendered null and void. COGSA states:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to **or in connection with the goods, arising from** negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

46 U.S.C. app. § 1303(8) (emphasis added); *see Ataei v. M/V Barber Tonsberg*, 639 F.Supp. 993, 1002 (S.D.N.Y.1986). Although some clauses can be rendered null and void on their face, one court has suggested that bill of lading clauses that shift liability for

---

**6.** This type of conversion and intermixing of tort and contract principles appears to occur frequently in complex admiralty cases. *See Skibs A/S Gylfe v. Hyman–Michaels Co.*, 438 F.2d 803, 805 n. 1 (6th Cir.), *cert. denied*, 404 U.S. 831, 92 S.Ct. 73, 30 L.Ed.2d 61 (1971); *Poliskie Line Oceaniczne v. Hooker Chem. Corp.*, 499 F.Supp. 94 (S.D.N.Y.1980).

damages may be upheld if, after evaluating the actions of the carrier, the court finds that the damages did not arise from any carrier negligence, fault or failure of duties mandated by COGSA. *See Ataei*, 639 F.Supp. at 1002. Under such an analysis, the court must first evaluate the carrier's actions before it could find that the clauses in a bill of lading that attempt to hold the shipper and the consignee liable for damages associated with dangerous cargo do not violate COGSA. *See id.*

Both parties rely on *Poliskie Line Oceaniczne v. Hooker Chem. Corp.*, 499 F.Supp. 94 (S.D.N.Y.1980), to support their respective arguments as to whether a proximate cause analysis is warranted in order to determine liability for contract breach damages. The *Hooker* court considered the liability for damages caused to a vessel while underway as the result of the spilling of sulphur dichloride from drums loaded in a shipping container by Hooker Chemical. *Id.* at 96. The plaintiff shipping company asserted a tort claim alleging that "the defendant is liable for such damages because the proximate cause of the difficulties was the defendant's improper stowage of the drums in the container." *Id.* at 97. The court recognized that Hooker had violated C.F.R. regulations governing the stowage of hazardous cargo and that such a violation constituted negligence per se. *Id.* The court undertook an exhausting negligence and proximate cause analysis to determine the tort liability and in so doing discounted numerous allegations of carrier negligence. The main issue in the case was whether the method of stowage by defendant Hooker was both negligent and the proximate cause of the damages. *Id.* at 97–101.

In *Hooker* the plaintiff also asserted a contract cause of action that alleged that the "defendant breached its express and implied warranties" contained in the bill of lading that warranted the sulphur dichloride had been properly stored. *Id.* at 101. According to the court, the bill of lading provided that the "[d]efendant agreed by contract to indemnify the vessel for the consequences of poor stowage." *Id.* at 102. The *Hooker* court announced its conclusion with respect to the tort and contract causes of action as follows:

I find that defendant's negligence in connection with the stowage of the container was the proximate cause of damage to plaintiff, rendering defendant liable therefor under a theory of negligence, as well as by virtue of defendant's breach of contract and express warranty.

*Id.* at 102. ENS argues that the *Hooker* court's findings support its argument that the contract breach alone was sufficient to impose liability on the shipper. On the other hand, Degesch Chile and Degesch America argue that the court in *Hooker* was only able to find liability on the contract after finding Hooker's negligence to be the proximate cause of the damages and also establishing that the carrier was free from fault or negligence.

This court agrees with the interpretation of Degesch Chile and Degesch America. *Hooker* is distinguishable in several important respects. In that case there was no dispute that Hooker had properly marked the hazardous substance as such on the bill of lading, the dock receipt and the shipping container. Additionally, plaintiff was aware of the container's corrosive nature because it was listed on its dangerous cargo manifest. *Id.* at 101. Most importantly, the actions of the defendant in stowing and preparing the barrels of sulphur dichloride were at issue and a violation of the regulations pertaining to the loading of the sulphur dichloride had to be determined before the court could find that the defendant was liable in contract under the indemnification terms of the bill of lading. In other words, the contract liability required the court to determine that Hooker's method of packing the barrels in the shipping container was in violation of the government regulations and that such violation was a proximate cause of the damages. The applicable clauses of the *Hooker* bill of lading stated:

Should the goods be refused exportation or importation by any government or authority or by anybody purporting to act with the authority of any government or authority or should the goods in the Carrier's opinion be in such condition that he

considers it advisable to discharge, transship, return, remove or destroy them, then he shall be entitled to do so at any port or place. In such case the Merchant shall bear the risk for the goods and the costs directly or indirectly incurred.

. . . . .

**The Merchant shall be liable for all fines and/or losses which the carrier, vessel or cargo may incur in connection with the cargo through non-observance of Custom House and/or import or export regulations.**

*Hooker,* 499 F.Supp. at 102 (emphasis added). Under the terms of the indemnification clause, only after finding that defendant failed to observe the regulations associated with the stowage of the cargo and that such failure was the proximate cause of the damages, was the court able to find liability for the fines and losses imposed on the carrier in connection with those violations.

In this case, it is undisputed that Degesch Chile failed to properly identify the magnesium phosphide on the bill of lading. However, this court cannot as a matter of law and absent any analysis of foreseeability find that all the damages associated with the magnesium phosphide were due to its failure to properly label the cargo as hazardous on the bill of lading. Even the bill of lading upon which ENS relies contains language that requires the carrier's damages to be causally connected to any inaccurate marks. It states:

> The shipper agrees to be liable for and to indemnify the Carrier, and all participating carriers, without limitation in amount, and the Carrier shall have a lien on the goods in respect to any losses, detentions, damages, injuries, responsibilities, fines or penalties or expenses **arising from inaccuracy of the particulars, or marks, and noncompliance with the warranties, or the regulations as specified above** . . . .

(emphasis added). Therefore, this court denies ENS's Motion for Summary Judgment against Degesch America and Degesch Chile.

■ This court also denies Degesch America's Motion for Summary Judgment. Even though Degesch America was the consignee and purchaser of the magnesium

phosphide, in admiralty, consignees can be held to be parties to a bill of lading under agency law.

The general rule is that where a consignee purchases merchandise from a seller and authorizes the seller to ship the goods, the seller as shipper or consignor is the consignee's agent for the purpose of shipping. The shipper or consignor is impliedly authorized to enter into the usual and customary transportation contract with the carrier, and the consignee is bound by such terms.

1 S. Sorkin, *Goods in Transit,* § 2.01[4] at 2–10 (1994). Further, in the light most favorable to the nonmoving party, there remain genuine issues of material fact, such as the nature and extent of the corporate relationship between Degesch America and Degesch Chile, that preclude summary judgment.

### 2. The Arsenic Trioxide

■ ENS also moves for Summary Judgment against El Indio and CSI on an indemnity theory arising from the bill of lading. Although the arsenic trioxide containers were properly labeled and manifested as hazardous, ENS states that pursuant to the terms of the bill of lading, El Indio and CSI must reimburse ENS for the expenses related to execution of the Administrative Order to recover the arsenic trioxide. ENS relies on clause five of the bill of lading which in part states:

> 5. TRANSHIPMENT, LIBERTIES, GOVERNMENT DIRECTIONS. . . . (b) The Carriers shall have the liberty to comply with any orders or directives whatsoever of any government or any person acting or purporting to act under the authority thereof . . . . . (e) For extra services rendered pursuant to this clause, the Carrier shall be entitled to reasonable extra compensation.

In addition to this clause, ENS also relies on clause six of bill of lading, the hazardous cargo clause quoted in full above. Making an analogous argument under that clause to the one it made with respect to Degesch Chile and Degesch America, ENS argues that El Indio, the seller, and CSI, the consignee, are liable under the definition of "goods" to bear

any extra charges or expenses occasioned by the arsenic trioxide.

■ This court cannot uphold such a broad interpretation of the bill of lading without addressing the carrier's actions with respect to the arsenic trioxide that was lost overboard. Adopting ENS's position would mean that under the bill of lading at issue, any time a vessel carries hazardous cargo, the consignee and shipper of that cargo, who pay an extra hazardous cargo fee to the common carrier, remain strictly liable for any damages associated with those goods regardless of the reason those damages are incurred. This rationale would return to the carrier the type of unbridled power to shift liability that COGSA attempted to end. *See Hanover Ins. Co. v. Shulman Transp. Enters. Inc.*, 581 F.2d 268, 270 (1st Cir.1978). Further, a bill of lading cannot release a carrier of its duties and obligations under COGSA which requires that the vessel be seaworthy, properly manned, equipped and supplied, 46 U.S.C. app. § 1303(1), and imposes on the carrier the duty to "properly and carefully ... handle, stow, carry, keep, care for and discharge goods carried." *Id.* § 1303(2).

The court recognizes that most cases applying COGSA do so in terms of determining liability for damage or loss directly to the goods themselves. This case does not involve reimbursement to the owner of the goods[7] for damage or loss to the goods themselves, but rather involves reimbursement to the carrier for significant costs associated with the recovery of hazardous goods lost overboard during a storm. This court cannot justify imposing the liability for all the expenses related to the cleanup and recovery of the arsenic trioxide on El Indio or CSI based solely on the terms of the bill of lading thereby allowing the court to turn its head to any of ENS's actions that might have caused or contributed to the loss of the arsenic trioxide. Focusing on the language of section 1303(8) of COGSA, clauses that relieve the carrier from liability for "loss or damage to **or in connection with** the goods,

arising from negligence, fault, or failure in the duties and obligations" of the carrier or "lessening such liability" of the carrier as provided in COGSA are rendered null and void. *Id.* § 1303(8) (emphasis added). It is the opinion of this court that the financial loss and damage that ENS is attempting to recover was clearly incurred "in connection with" the goods and therefore recovery under the terms of the bill of lading requires an analysis to determine if the carrier was in any manner negligent or at fault. *See Ataei*, 639 F.Supp. at 1002.

■ By comparison, the section of COGSA discussing hazardous cargo shipped with the knowledge and consent of the carrier relieves the carrier of liability if those goods become a danger to the ship or other cargo and the carrier makes a conscious decision to land, destroy or render innocuous the hazardous cargo. It states:

> If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any.

46 U.S.C. app. § 1304(6). This section does not relieve the carrier of all liability associated with the hazardous goods regardless of what happens to the goods. Instead, it requires a conscious decision on the part of the carrier to dispose of the goods if they become a danger to the ship or other cargo and it recognizes that there are limits to the circumstances under which the carrier may be found free from liability when it knowingly accepts hazardous goods that become a danger to the ship. *See id.* Therefore, section 1304(6) is inapplicable to the facts with respect to the arsenic trioxide because the arsenic trioxide was inadvertently lost overboard.

### B. CERCLA Liability

In addition to asserting that Degesch America cannot be held liable under the terms of the bill of lading, in its Motion for

---

7. Under the circumstances, neither CSI or El Indio claims to be the owner of the arsenic

trioxide at the time of the overboard loss.

Summary Judgment, Degesch America also argues that it cannot be liable under CERC-LA. Further, ENS moves for Summary Judgment against both El Indio and CSI asserting that either one, as owner of the arsenic trioxide, is a potentially responsible party under CERCLA. The application of CERCLA to the circumstances of this suit appears to be one of first impression. To address these issues, this court must first review the liability requirements of CERCLA.

To establish a case for liability under CERCLA requires proof of four elements. The statute states:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> . . . . .
>
> (4) .... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> . . . . .
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607(a). Any person[8] who incurs costs as a result of an abatement action may seek contribution from any other person who is also a CERCLA potentially responsible party.[9] *Id.* § 9613(f)(1). In summary, under the circumstances of this case, for CERCLA liability to attach requires (1) a person to be an owner or operator, (2) of a vessel or a facility, (3) from which there has been a release or a threatened release of a hazardous substance, and (4) which has resulted in costs that are necessary and consis-

tent with the national contingency plan. Further, the Fourth Circuit has repeatedly stated that section 9607(a) establishes a strict liability scheme that does not encompass the traditional notions of tort culpability and is subject only to the defenses specifically enumerated in the statute. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841, 845 (4th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *United States v. Monsanto Co.*, 858 F.2d 160, 167–68 & n. 11 (4th Cir.1988).

■ The crux of this case depends on the owner or operator liability of section 9607(a)(1). "Owner or operator" is an expressly defined term in the statute. Section 9601 states:

> (20)(A) The term "owner or operator" means (i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility ...
>
> (B) In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 9607(a)(3) or (4) of this title, (i) **the term "owner or operator" shall mean such common carrier** or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) **the shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control.**
>
> (C) In the case of a hazardous substance which has been delivered by a common or contract carrier to a disposal or treatment facility and except as provided in section 9607(a)(3) or (4) of this title, (i) the term "owner or operator" shall not include such

---

**8.** Person is defined broadly to include "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

**9.** The court addresses only the owner or operator category of potentially responsible parties under

§ 9607 because it is this section that ENS relies on to establish CERCLA liability for El Indio and CSI in its Motion for Summary Judgment. Additionally, Degesch America relies on this section to argue that the court should find it cannot be liable under CERCLA in its summary judgment motion.

common or contract carrier, and (ii) such common or contract carrier shall not be considered to have caused or contributed to any release at such disposal or treatment facility resulting from circumstances or conditions beyond its control.

42 U.S.C. § 9601(20) (emphasis added).

The applicability of this definition is a matter of dispute between the parties. When the arsenic trioxide was lost overboard and when the magnesium phosphide was spilled, both were in the possession of M/V SANTA CLARA I, the common carrier and not the actual title owner. Therefore, this court is called upon to undertake a statutory interpretation of owner or operator liability as it applies to common carriers when a release of a hazardous substance occurs and the hazardous substance is in the physical possession of the common carrier.

In determining the application of the definition of an owner or operator contained in section 9601(20), this court will keep in mind several basic rules of statutory construction. "Where ... resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Monsanto Co.,* 858 F.2d at 167 n. 10 (quoting *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984)). Further, it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). Specific provisions of a statute shall govern the more general. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992).

The specific issue to be addressed is whether the definition contained in section 9601(20)(B) divests the actual title owners or shippers of hazardous substances of their CERCLA liability ownership after the hazardous substances have been accepted by a common carrier for transportation and are in possession of the common carrier when a release occurs if the shipper can demonstrate that the release resulted solely from conditions beyond its control. A reading of the express statutory language would appear to support the conclusion that during transportation, the common carrier becomes the CERCLA owner or operator responsible for any release that occurs solely from circumstances and conditions beyond the control of the shipper under 9601(20)(B).

This court finds that section 9601(20)(B) is applicable to this case with respect to both the spilled magnesium phosphide and the lost arsenic trioxide. Based on both the express statutory language and the legislative history of section 9601(20)(B), this court cannot accept the argument of ENS that nonculpable shippers who arrange for the shipment of hazardous substances from which there is a later release or threatened release can be held as potentially responsible owners based on section 9601(20)(A) in addition to the common carrier absent the showing required under (20)(B)(ii). Such an interpretation would render meaningless the express language of section (20)(B)(i). The language of the statute states that when hazardous substances are accepted for transportation by a common carrier, "owner or operator" shall mean the common carrier and the shipper cannot be held liable for any release during transportation [10] that resulted from circumstances beyond its control. 42 U.S.C. § 9601(20)(B).

A review of the brief legislative history provided for section 20(B) clearly mandates the interpretation adopted by the court.[11]

---

**10.** Transportation is defined as "the movement of a hazardous substance by any mode, including a hazardous liquid pipeline facility (as defined in the Pipeline Safety Act), and in the case of a hazardous substance which has been accepted for transportation by a common or contract carrier, the term 'transport' or 'transportation' shall include any stoppage in transit which is temporary, incidental to the transportation movement, and at the ordinary operating convenience of a common or contract carrier, and any such stoppage shall be considered as a continuity of movement and not as the storage of a hazardous substance." 42 U.S.C. § 9601(26).

**11.** This is true even though such an application appears to contradict several of the basic precepts of CERCLA liability by decreasing rather than increasing the number of potentially responsible parties, by providing the shippers of hazardous substances with an apparent "defense" not specifically enumerated by the statute

The legislative history demonstrates that section 20(B) originated as Amendment No. 772 [12] to the Senate CERCLA bill to specifically govern accidents occurring when hazardous substances are in the common carrier's physical possession. Staff of Senate Comm. on Env't & Pub. Works, 96th Cong. 1st Sess., *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), Pub.Law 96–510*, (Comm.Print 1983), *reprinted in* 3 Arnold & Porter Legislative History: P.L. 96–510, at 66 (Appendix II) (available on Westlaw in CERCLA–LH database) (hereinafter "Arnold & Porter"). The section's history is briefly revealed in a series of letters in November 1979 between Senators Randolph and Stafford of the Senate Committee on Environment and Public Works and Mr. Edwin M. Wheeler of the Fertilizer Institute. *Id.* at 63–69. The correspondence indicates the fertilizer industry's concern that the CERCLA bill as drafted without the amendment "would create liability in situations where a shipper cannot exercise control." *Id.* at 67. The legislative history of section 20(B) states:

> During the course of transporting hazardous and toxic materials, accidents occur when the circumstances were beyond the control of the owner of the substance involved. The most common example of such incidents is a railroad derailment resulting from tracks which are inadequate for the loads being shipped over them or through the negligence of railroad personnel. Since such circumstances are clearly beyond the control of the owner of the

product, the owner should not be held liable.

> However, in those cases where the product owner does exercise control over the condition which resulted in the release, then liability should be imposed. It is intended that liability be imposed on the product owner only where there has been some culpability and reasonable action on the part of said product owner would have prevented the release. . . .

> . . . .

> The . . . amendment clarifies the intent with regard to liability for an accident during transportation of fertilizers or any other potentially harmful substance [Sec. 101(20)(B) ]. This amendment makes it clear that if a manufacturer exercises good care, and if an accident is caused by events wholly outside the manufacturer's control, then the manufacturer would not be liable for damage caused by a spill. However, if a manufacturer fails to exercise due care (such as by failing to properly lable [sic] or properly package) and if that failure contributes to damage, then the manufacturer could be held liable.

*Id.* at 68–69.

The legislative history is instructive in several respects. First, although the original text of the law included the word "generator," the intention of Congress appeared to be to protect the manufacturer or owner of the hazardous substance by recognizing that in most cases, the manufacturer or owner is the entity that arranges for shipment of the

---

under 9607(b), and by requiring the court to conduct a "causation-type" analysis with respect to the shipper's activities in order to determine if the circumstances of the release were beyond the shipper's control.

**12.** The exact language of the amendment as included in the legislative history differs in a few minor respects from the current law. The amendment language stated:

> (16) in the case of a hazardous substance which has been accepted for transportation by a common or contract carrier (A) the term "owner or operator" shall mean such common carrier or other bona fide for-hire carrier acting as an independent contractor during such transportation, (B) the **generator** of such hazardous substance shall not be considered to

have caused or contributed to any discharge or release during such transportation which resulted solely from circumstances or conditions beyond his control.

Staff of Senate Comm. on Env't & Pub. Works, 96th Cong. 1st Sess., A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), Pub.Law 96–510, (Comm.Print 1983), *reprinted in* 3 Arnold & Porter Legislative History: P.L. 96–510, at 66 (Appendix II) (emphasis added). The amendment language differs from the current text of § 9601(20)(B) in that the current text provides for the exception under 9607(a)(3) and (4) and additionally the word "shipper" has replaced the word "generator."

substance. The current text of the law adopted in 1986 substitutes the word "shipper" for "generator." Although "shipper" is not a defined term in CERCLA, the shipper of a good is a broader category of individuals than the generator in that the shipper can be either the purchaser or the manufacturer seller. The word "shipper" is defined by international shipping law as follows: " '[S]hipper' means an owner or person for whose account the ocean transportation of cargo is provided or the person to whom delivery is to be made." 46 U.S.C. app. § 1702(23) (Supp.1994) (emphasis added); *see Black's Law Dictionary* 1378 (1990). Therefore, the term shipper can include either the seller or the purchaser of the substance.

Second, the legislative history substantiates the congressional intent that, under 9601(20)(B), shippers of a hazardous substance who exercise due care when arranging for the shipment of that substance should not be held liable under CERCLA for releases that occur outside their control.[13] However, if the release occurs in part from a circumstance or condition within the control of the shippers, they can be found to have contributed to or caused the release thereby returning to them the general liability imposed on owners or operators under 20(A)(ii). In other words, the owner or manufacturer contributing to or causing a release loses the protection afforded it under (20)(B)(ii) as a shipper and faces potential liability as the owner of an onshore or offshore facility under (20)(A)(ii). In this court's opinion, such an interpretation does not relieve a common carrier from facing CERCLA liability as an "owner" under (20)(B)(i) in addition to the actual owner of the facility under (20)(A)(ii). A finding of more than one CERCLA "owner" under section 9607(a)(1) as defined by the subsections of 9601(20), to possibly include both the title owner of the hazardous substance and the common carrier if both contributed to or caused a release or threatened

release, is consistent with CERCLA's statutory contribution scheme of section 9613(f) which permits the allocation of response costs using equitable factors that the court deems appropriate. 42 U.S.C. § 9613(f); *see Environmental Transp. Sys. Inc., v. ENSCO, Inc.,* 969 F.2d 503, 507 (7th Cir.1992). With this interpretation in mind, the court will now address the elements of CERCLA liability as they pertain to the arsenic trioxide loss and the magnesium phosphide spill.

### a. The Arsenic Trioxide

With respect to the arsenic trioxide loss, this court denies ENS's Motion for Summary Judgment based on the CERCLA liability of CSI and El Indio and also denies El Indio's Motion for Summary Judgment. For the benefit of the parties, this court will address each of the CERCLA liability elements.

 First, this court finds the loss overboard of the arsenic trioxide approximately thirty miles off the New Jersey coast constituted a release of a hazardous substance into the environment. The definition of release encompasses "disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). This court finds that a release occurred when the shipping containers fell into the ocean. Further, it is clear from the evidence that the shipping containers were damaged and the barrels containing the arsenic trioxide separated from the containers when they came to rest on the ocean floor. The term "environment" includes "the ocean waters of which natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act." *Id.* § 9601(8). Finally, arsenic trioxide is a CERCLA hazardous substance. *See id.* § 9601(14).

---

**13.** This interpretation is analogous to the rationale provided in *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994). Although that case dealt with liability for a spill under section 9607(a)(3), the court stated: "It would be an extraordinary thing to make shippers strictly liable under the Superfund statute for the consequences of accidents to common carriers or other reputable transportation companies that the shippers had hired in good faith to ship their products." *Id.* at 751 (citing *Indiana Harbor Belt R.R. v. American Cyanamid Co.,* 916 F.2d 1174, 1180–81 (7th Cir.1990)).

■ Second, this court finds that the shipping containers and the barrels holding the arsenic trioxide were CERCLA facilities. *See id.* § 9601(9). To hold that shipping containers are not facilities simply because they contain barrels which in turn contain a hazardous substance would allow an individual to easily circumvent CERCLA liability and is unacceptable. Additionally, this court is of the opinion that arsenic trioxide, whether in an enclosed barrel or spilled into the ocean, does not qualify under the exception to the definition of a facility as a "consumer product in consumer use." *Id.; see Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1232–34 (E.D.Pa.1993).

■ Third, this court finds that at least some of the expenses incurred by ENS to recover the arsenic trioxide were necessary and consistent with the national contingency plan ("NCP"). *See* 42 U.S.C. § 9607(a)(4)(B). Factual disputes as to whether all the costs incurred by ENS were necessary and consistent with the NCP do not preclude this court from determining at this stage that there is adequate evidence in the record to conclude that by complying with the Administrative Order to clean up the arsenic trioxide, ENS has incurred some expenses that are both necessary and consistent with the NCP. *Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1269, 1276–77 (E.D.Va.1992); 40 C.F.R. § 300.700(c)(3)(ii) (1994). A detailed factual analysis to determine which costs incurred by ENS were in fact "necessary" and "consistent" with the NCP can be undertaken at a later date if and when this court is called on to address the issue of apportioning the damages for the arsenic trioxide loss. *Chesapeake & Potomac Tel Co.,* 814 F.Supp. at 1276–77 & n. 8.; *see Nurad,* 966 F.2d at 841 n. 2. Under section 9613(f), ENS is entitled to recover contribution from any other person who can be characterized as a potentially responsible party under 9607(a) including an owner that does not qualify for the shipper protection of 9601(20)(B).

■ Fourth, this court finds that when the release occurred, ENS's liability originated not only from being the owner of the vessel from which the release occurred, but also from its position as the common carrier of a hazardous substance that was released during transportation. As the common carrier of the hazardous substance, ENS became the CERCLA owner or operator of the arsenic trioxide under 9607(a)(1) and 9601(20)(B)(i).[14] ENS accepted the arsenic trioxide well aware of its hazardous character and charged an increased fee for its transportation. The release occurred when the arsenic trioxide was in the possession of ENS and during the transportation of the chemical. By operation of section 9601(20)(B)(ii), the shipper of the arsenic trioxide is relieved of its ownership if the release resulted "solely from circumstances beyond his control."

■ The determination under 9601(2)(B)(ii) precludes a summary judgment ruling for several reasons. First, there is a dispute as to which party was the shipper of the arsenic trioxide under the terms of the sales contract.[15] The statute requires the court to focus on the acts of the shipper in relation to the causes of the release; therefore, the shipper's identity must be resolved. Second, the statute requires a determination as to whether the release resulted "solely from circumstances or conditions beyond" the shipper's control. This section requires the court to undertake a factual determination as to (1) the causes and circumstances that resulted in the release and (2) whether the release resulted **solely** from causes and circumstances that were beyond the control of the shipper. Turning again to the legislative history reveals liability could be imposed on the shipper if the facts reveal some culpability or lack of due care, which contributed in any way to the release, or a failure of the shipper to exercise reasonable action which would have prevented the release. *See* Arnold & Porter, at 69.

---

**14.** ENS acknowledges that "this provision of CERCLA would establish their status as a CERCLA 'owner or operator' during their actual transportation of any hazardous substance."

**15.** Whether El Indio or CSI was the owner of the arsenic trioxide under the terms of the sales contract when the release occurred is disputed.

■ This court cannot accept ENS's argument that a separate liability can be imposed on the owner of the arsenic trioxide on the basis of the threat of release when the barrels as facilities became stationary on the ocean floor. ENS argues that when the arsenic trioxide was lost overboard, the "transportation" of the hazardous substance ceased, and the actual owner's CERCLA liability can be imposed not from the overboard loss of the arsenic trioxide, but rather from the "separate threat of release after the drums had come to rest on the ocean floor." ENS claims that under the statutory definition of transportation, that both factually and legally, transportation of the arsenic trioxide provided by ENS ceased when the barrels were lost overboard. *See* 42 U.S.C. § 9601(26). To accept this argument would circumvent the protection afforded to the owner under 9601(20)(B) by imposing strict liability on the shipper whenever a release occurs when the substances are in the possession of the carrier. Further, it is clear that any secondary release or threat of release from the barrels on the ocean's floor is inextricably linked with the loss overboard during transportation by the common carrier.

■ Having addressed the elements of CERCLA liability, this court will now briefly, but reverently, address the "act of God" defense provided by section 9607(b)(1). CERCLA defines this defense to mean "an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1). In order to be free from CERCLA liability, the potentially responsible party must establish by a preponderance of the evidence that the release or threat of release and the associated damages were caused solely by the defense asserted. *Id.* § 9607(b); *United States v. Stringfellow,* 661 F.Supp. 1053, 1061 (C.D.Cal.1987). Further, CERCLA adopted the same standard of liability as the Clean Water Act. 42 U.S.C. § 9601(32); *New York*

*v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985).

At present this court believes that there is ample evidence in the record about the events surrounding the offshore storm on the night of January 3, 1992 to conclude that the act of God defense is not available to any of the parties.[16] Even a poorly forecasted storm has been held under the Clean Water Act not to constitute an act of God because it was predicted and was avoidable. *See Liberian Poplar Transp., Inc. v. United States,* 26 Cl.Ct. 223, 226 (1992). The evidence in the record is clear that inclement weather offshore was predicted by the National Weather Service and known by the captain and crew prior to their departure from Port Elizabeth. In fact, several crew members stated that they were told to expect bad weather and were directed to take extra precautions to insure that the vessel and its cargo were secure for rough seas. Even if the evidence demonstrated that the storm was worse than predicted, this court finds that the storm the M/V SANTA CLARA I encountered was not the type of "unanticipated grave natural disaster" or "other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1). Therefore, the act of God defense is not applicable to this case.

### b. The Magnesium Phosphide

This court denies Degesch America's Motion for Summary Judgment on its CERCLA liability.[17] Relying on section 9601(20)(B), Degesch America maintains that it cannot be a potentially responsible party under CERCLA. This court will briefly review some of the elements of CERCLA liability as they relate to the magnesium phosphide spill.

■ First, with respect to the spilling of the magnesium phosphide from the drums on board the M/V SANTA CLARA I, this court

---

**16.** This court finds that the defense is not available to either the arsenic trioxide loss or the magnesium phosphide spill.

**17.** A determination of CERCLA liability was not a basis of ENS's Motion for Summary Judgment against Degesch Chile and Degesch America.

concludes as a matter of law that under CERCLA, there was a release of a hazardous substance into the environment. Release is defined to include "any spilling, leaking, . . . emitting, emptying, . . . escaping, leaching dumping or disposing into the environment." 42 U.S.C. § 9601(22). Environment encompasses "ambient air within the United States or under the jurisdiction of the United States." *Id.* § 9601(8). It is undisputed that when the vessel arrived in Charleston, over 800 pounds of magnesium phosphide had spilled into the holds of the vessel.

▪ Further, this court finds that the drums containing the magnesium phosphide were facilities. A facility includes a "storage container . . . or any site or area where a hazardous substance has come to be stored, disposed of, or placed, or otherwise come to be located but does not include any consumer product in consumer use or any vessel." This court is further of the opinion that much like arsenic trioxide, magnesium phosphide, whether in contained and sealed drums or spilled into the environment, does not qualify as a "consumer product in consumer use." *See Reading Co.,* 823 F.Supp. at 1232–34.

▪ Third, this court concludes that when the release occurred, ENS was the CERCLA common carrier of a hazardous substance that released during transportation and therefore a CERCLA "owner or operator." 42 U.S.C. § 9601(20)(B). The release occurred when the drums were in the possession of ENS and during the transportation of the chemical.

▪ ENS argues that even under 9601(20)(B), it should not be held liable as a CERCLA owner because that section imposes liability on the common carrier "[i]n the case of a hazardous substance which has been **accepted** for transportation." (emphasis added). ENS contends that because the magnesium phosphide was not properly noted .as a hazardous substance on the bill of lading, the hazardous substance was not actually "accepted" for transportation. However, this court disagrees with ENS's interpre-

tation because section (20)(B)(ii) allows the common carrier to shift its liability to the shipper if the release was caused in any part by any condition or circumstance within the control of the shipper. Further, the legislative history reveals Congress expressly contemplated this type of circumstance. The legislative history committee report states:

> This amendment makes it clear that if a manufacturer exercises good care, and if an accident is caused by events wholly outside the manufacturer's control, then the manufacturer would not be liable for damage caused by a spill. However, if a manufacturer fails to exercise due care (such as by failing to properly lable [sic] or properly package) and if that failure contributes to damage, then the manufacturer could be held liable.

Arnold & Porter, at 69.

It is undisputed that the magnesium phosphide was not identified as a hazardous substance on the bill of lading, but there is evidence that the barrels were identified with individual "poison" and "dangerous when wet" labels. In this court's opinion, the failure to properly identify the magnesium phosphide as a hazardous substance on the bill of lading was a circumstance or condition within the control of the shipper under section (20)(B)(ii). Whether that failure contributed in any way to the damages resulting from the release is an issue that must be resolved at trial.

▪ In addition to a causation analysis, this court must also determine the identity of the CERCLA "shipper." As has been previously discussed, the shipper can be either the seller, Degesch Chile, or the purchaser, Degesch America. However, that issue was not fully briefed for the court [18] and there remain other issues of material fact with respect to the corporate relationship between Degesch Chile and Degesch America. Therefore, in the light most favorable to the nonmoving party, this court believes it is appropriate to deny Degesch America's motion for summary judgment.

---

**18.** Additionally, there is inadequate evidence before the court to address the extent to which the costs incurred by ENS to cleanup the magnesium phosphide were necessary and consistent with the NCP.

### IV. CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE,**

**ORDERED** that ENS's Motion for Summary Judgment against El Indio, CSI, Degesch Chile and Degesch America be **DENIED,**

**ORDERED** that Degesch America's Motion for Summary Judgment against ENS be **DENIED,**

**ORDERED** that El Indio's Motion for Summary Judgment against ENS be **DENIED,**

**AND IT IS SO ORDERED.**