**Maureen DUNN, Plaintiff,**

v.

**STANDARD INSURANCE COMPANY, and Balfour Beatty, Inc. a/k/a Balfour Beatty Construction, Inc., Defendants.**

**No. CIV.3:00CV00219(AWT).**

United States District Court, D. Connecticut.

Aug. 23, 2001.

---

Mark S. Neistat, Neistat & Mason, Newington, CT, for plaintiff.

George J. Kelly, Jr., Siegel, O'Connor, Schiff & Zangari, New Haven, CT, Eric

Paltell, Piper Marbury Rudnick & Wolfe, Baltimore, MD, for defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

The plaintiff, a former employee of Balfour Beatty Insurance Company, brings this action asserting a claim against each defendant pursuant to 29 U.S.C. § 1132(a)(1)(B) for wrongful denial of employee welfare benefits and a claim against each defendant for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et seq.* ("CUTPA"). The defendants have moved for summary judgment on all four counts of the plaintiff's complaint. For the reasons stated below, the defendants' motion for summary judgment is being granted as to all counts.

### I. FACTUAL BACKGROUND

The plaintiff, Maureen Dunn ("Dunn"), resides in Old Saybrook, Connecticut. Old Saybrook borders Old Lyme, Connecticut, where Lyme disease was first reported in 1975. From August of 1997 until June 23, 1998, Dunn was employed as a full-time assistant document controller by defendant Balfour Beatty, Inc., a/k/a Balfour Beatty Construction, Inc. ("Balfour"). On June 23, 1998, Dunn ceased working, as recommended by her employer, due to disabling symptoms such as depression, fatigue, anxiety, blurry vision, dizziness, memory loss and numbness in her limbs.

As an employee of Balfour, Dunn was covered under Balfour's self-funded short-term disability plan ("STD Plan"). The 1996 summary of benefits for the STD Plan states that short-term disability benefits last for up to 13 weeks. The summary also states that the benefits listed therein are subject to being changed or canceled without notice.

When the plaintiff stopped working, she applied for coverage under the STD Plan. She received disability benefits for a period of 26 weeks, i.e., from July 7, 1998 through January 1, 1999. The plaintiff received 26 weeks of benefits because it was Balfour's policy at the time to give 26 weeks of benefits under the STD Plan, notwithstanding the fact that the 1996 summary of benefits stated that only 13 weeks of benefits would be provided.

When Dunn's short-term disability payments ceased, she applied for benefits under Balfour's long-term disability plan ("LTD Plan"). The LTD Plan was issued by defendant Standard Insurance Company ("Standard") to Balfour, and Standard is the administrator of the LTD Plan. It became effective May 1, 1996.

The LTD Plan contains an "Exclusions and Limitations" section whereby a pre-existing condition exclusion period of 90 days applies to any individual who has not been continuously insured under the policy for twelve months. Under this exclusion, an employee may be denied long-term disability benefits if the employee is claiming disability for a mental or physical condition for which he or she, during the 90–day exclusion period, a) consulted a physician, b) received medical treatment or services, or c) took prescribed drugs or medications. The LTD Plan states that

> you are not covered for a disability caused or contributed to by a preexisting condition or medical or surgical treatment of a preexisting condition unless, on the date you become disabled, you ... have been continuously insured under the group policy for the entire exclusion period ... and have been actively at work for at least one full day after the end of the exclusion period.

Pavick Aff. Ex. A. at D 10013. In Dunn's case, the 90–day period prior to her being covered by the LTD Plan commenced on June 20, 1997 and ended on September 17, 1997.

### A. Dunn's Relevant Medical History

Upon Standard's receipt of the plaintiff's claim under the LTD Plan, it was assigned to Michelle Pavick, a disability benefits analyst. Pavick reviewed Dunn's medical records. Pavick learned that the plaintiff saw a general practitioner, Dr. James Petrelli, on two separate occasions during the preexisting condition exclusion period. During the plaintiff's first visit, on July 9, 1997, Dr. Petrelli noted Dunn's symptoms as follows: "Complaint of nervousness. Patient having major stresses in life, marital difficulties with their business and children. Patient exhibiting signs of mild depression, sleep disorder, lack of appetite, [emotionality]. Lack of energy. Patient also complaining of symptoms of sweats, chills, myalgias, runny nose." Pavick Aff. Ex. A at 10176. Dr. Petrelli prescribed Paxil and Xanax for Dunn's "depression with anxiety." Id. He also prescribed remedies for a viral illness and for gastroesophageal reflux disease. On July 22, 1997, for Dunn's second office visit, Dr. Petrelli recorded her symptoms as follows: "Anxiety, depression. Patient has started marital counseling which she says is helping a lot. She stopped the Paxil because of dizziness and dry mouth. Complaining of some right shoulder pain. Nonspecific,

denies trauma." Pavick Aff. Ex. A at 10175. Dunn was directed to continue using the Xanax on a limited basis for her "mild anxiety with depression." Id.

On November 20, 1997, Dunn visited Dr. Kornelia Keszler at her office in Madison, Connecticut. Dunn states that she went to see Dr. Keszler because of a complaint about an itchy red rash that both the plaintiff and her husband had noticed on Dunn's lower back in late October.[1] By the time Dunn actually saw Dr. Keszler, the rash was no longer visible. Dr. Keszler's notes from the November 20, 1997 visit indicate that Dunn's symptoms included involuntary loss of thirty-five pounds since July of 1997, family stress, depression, muscle stiffness, cramps, sinus congestion, numbness, heartburn and weepiness. There is no mention of the plaintiff having had a rash. However, Dr. Keszler did note that in 1991, another doctor suspected that the plaintiff had Lyme disease but Dunn's tests at the time yielded negative results.

After the plaintiff's November office visit, Dr. Keszler sent a blood sample to the University of Connecticut Health Center to be tested for Lyme disease. The laboratory reported that the tests results were "negative," but on December 9, 1997, Dr. Keszler telephoned the plaintiff and informed her that she had Lyme disease.[2] Throughout 1998, Dr. Keszler treated Dunn for Lyme disease and continued to record in her treatment notes that the

---

1. The plaintiff asserts that Dr. Keszler is "one of the few experts in Lyme Disease in the whole country." Pl.'s Mem. In Opp's to Summ. J. at 15. However, there is no evidence in the record to support this contention.

2. In a November 29, 2000 report, Dr. Keszler stated that the plaintiff's laboratory tests suggested that the plaintiff had been exposed to Borrelia Burgdorferi, a bacteria that is a

causative agent of Lyme Disease. However, the court granted the defendants' motion to strike this report from the record because it was not available to Standard at the time it reviewed the plaintiff's claim in 1999. See Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir.1995) ("[A] district court's review under the arbitrary and capricious standard is limited to the administrative record.").

plaintiff's symptoms included numbness, depression, headaches, muscle aches and pains, and dizziness. In her March 6, 1998 treatment notes, Dr. Keszler made reference to a rash on the upper part of Dunn's back.[3] Additionally, during an April 21, 1998 visit, Dr. Keszler decided to refer the plaintiff to a psychiatrist, Dr. Stanbury, for psychiatric help for depression.

In May of 1998, at the direction of Dr. Keszler, Dunn underwent a Brain SPECT (Single Photon Emission Computed Technology) scan and a Brain MRI (Magnetic Resonance Imagery) scan. According to Dr. Keszler, the Brain SPECT results were grossly abnormal and indicated that some parts of the plaintiff's brain were not receiving uniform blood flow. Such findings can be seen in certain neurologic conditions of the brain, such as neuroborreliosis, associated with Lyme disease. The MRI results were also abnormal but the radiologist, Dr. Stoane, described the findings as "nonspecific." Pavick Aff. Ex. A at D 10132. Dr. Stoane additionally indicated that the MRI scan "raise[d] the question of a demyelinating process."[4] Id.

The plaintiff's blood was tested twice more for Lyme disease, on May 8, 1998 and December 28, 1998, by the University of Connecticut Health Center. On both occasions, the test results were negative.

### B. Standard's Review of Dunn's Claim

In addition to reviewing the plaintiff's relevant medical records, Pavick also reviewed Dunn's claim statement and her physician statement. On Standard's Long Term Disability Claim Employee's State-

ment form, Dunn indicated that her disability was due to depression, heart palpitations, fatigue, nervousness, numbness in her back and arms, headaches, memory problems, dizziness, blurry vision and pain in her left eye. Dunn also noted that her "sickness" was Lyme disease. On Standard's Long Term Disability Claim Attending Physician's Statement form, Dr. Keszler indicated that the plaintiff's primary diagnosis was Lyme disease and that her secondary diagnosis was Hyperlipidemia.

After collecting all relevant materials, Pavick forwarded Dunn's entire claims file to a vocational consultant. Dr. Bradley Fancher, an internist from Oregon, was the vocational consultant who reviewed Dunn's file. He provides Standard approximately 12 to 15 hours of consulting services per week. Upon reviewing the file, Dr. Fancher concluded that Dunn's medical records were "entirely nonspecific" for a diagnosis of Lyme disease. Attach. 4 to Def.'s Mem. in Opp'n to Summ. J. at 29. Dr. Fancher noted that abnormal Brain SPECTs have been reported in "virtually every disease process" and that such abnormal SPECTs would not be helpful in trying to diagnose Lyme disease. Id. at 30. Dr. Fancher concluded that the types of minor abnormalities that appeared in Dunn's MRI scan could be caused by multiple factors and are by and large in clinical practice ignored. Additionally, Dr. Fancher based his conclusion on the absence of evidence of (i) exposure history or a tick bite, (ii) a rash (i.e., erythema migrans) associated with Lyme disease that

---

**3.** The plaintiff states that this March 6, 1998 notation reflects the plaintiff's reminder to Dr. Keszler about the rash she had in October of 1997. However, the plaintiff's claim is that the rash was located on the *lower middle* part of her back.

**4.** This process causes the destruction, removal or loss of the myelin sheath of a nerve or nerves.

typically lasts for weeks,[5] (iii) serology tests with positive results, and (iv) specific physical findings such as acute arthritis, cardiac complications, or neurological abnormalities such as cranial neuritis, lymphocytic meningitis or encephalomyelitis.

On April 15, 1999, Dr. Fancher submitted his conclusions to Pavick. In his report, Dr. Fancher noted that because the disabling symptoms Dunn complained of were similar to those Dunn had experienced while being treated for depression by Dr. Petrelli during the exclusion period, the plaintiff appeared to be suffering from depression rather than from Lyme disease.

On May 11, 1999, Pavick wrote to Dunn and informed her that her claim had been denied. Pavick gave the following explanation:

> [W]ith regard to your diagnosis of Lyme Disease, as stated in our telephone conversation of April 19, 1999, your medical records on each occasion of Lyme Disease Testing (November 24, 1997, May 8, 1998 and December 29, 1998) yielded a negative serology.
>
> The Center for Disease Control (CDC) has established the criteria for diagnosing Lyme Disease. The University of Connecticut Hospital, where you were tested for Lyme Disease, was contacted by our physician consultant. Our physician consultant was informed, by the Director of Serology at the University of Connecticut Hospital, that they adhere to the CDC criteria for the diagnosis of Lyme Disease and that your Lyme Disease test results were negative. Also, the other 2 tests listed in your file[,] the MRI and the Speck Test, although abnormal, did not support or offer any specific diagnosis. Our physician con-

sultant concluded that he was unable to identify a physical illness that would prevent you from performing your occupation.

> Our conclusion is that the medical evidence in your file does not currently support a diagnosis of Lyme Disease. However, even if you had Lyme Disease, your claim would still be denied, due to the preexisting condition exclusion as you were seen and treated consistently from about July of 1997 through the present for many of the same physical and psychiatric complaints for which you are claiming disability.

Pavick Aff. Ex. A at D 10058.

On May 20, 1999, consistent with Standard's policy, the plaintiff made a written request for a review of her claim. Dunn stated that she had not contracted Lyme disease until October of 1997 and that she saw Dr. Keszler in November of 1997 "because of red marks on [her] lower back and extreme numbness in [her] face, arms and legs and back." Pavick Aff. Ex. A at D 10053–54.

In accordance with Standard's review procedures, Dunn's claims file was referred to its quality assurance unit. This unit re-evaluates the entire claims file and either reverses or affirms a group benefit examiner's decision. On December 22, 1999, Kim Gahan, a quality assurance specialist, informed the plaintiff's counsel that the quality assurance unit agreed with the initial decision to deny Dunn's claim. Gahan stated that although Dunn's physician had diagnosed her as having Lyme disease, Standard's physician consultant had found that the laboratory tests contradicted that diagnosis. She stated further that

---

**5.** Erythema migrans is a slowly expanding red annular lesion at least five centimeters in diameter with a central clearing often associated with symptoms such as chills, fever, backache, stiff neck, malaise, headache and vomiting. Dr. Fancher described this rash as quite large and the central clearing as like a bull's-eye.

although the actual diagnosis of Lyme disease had not been made during the exclusion period, Dunn was being treated during the exclusion period for the same set of symptoms which eventually led her physician to make a diagnosis of Lyme disease. In other words, the "set of symptoms for which she received treatment [had] been existent since July 1997." Pavick Aff. Ex. A at 10031.

## II. *LEGAL STANDARD FOR SUM-MARY JUDGMENT*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Board of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*,

477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

■ Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248, 106 S.Ct. 2505. Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw

all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock*, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The

question then becomes: is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the non-moving party? *See Anderson*, 477 U.S. at 248, 251, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Counts I and II

In Count I, brought pursuant to 29 U.S.C. § 1132(a)(1)(B), the plaintiff asserts that Standard's decision to deny the plaintiff's claim for long-term disability benefits is "erroneous, and wrong and incorrect, and a breach of the insurance policy for disability benefits ...." Compl. ¶ 11. In Count II, also brought pursuant to 29 U.S.C. § 1132(a)(1)(B), the plaintiff claims that Balfour's decision to stop disability payments "was erroneous and wrong and incorrect and a breach of contract." *Id.* at ¶ 9.

The plaintiff argues in opposition to the motion for summary judgment that Standard's decision to deny her claim for long-term disability benefits is subject to *de novo* review, and that even if the court does not apply the *de novo* standard of review, the denial of Dunn's claim was arbitrary and capricious. The court finds neither argument persuasive.

### 1. Standard of Review

The LTD Plan qualifies as an employee welfare benefit plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002. Dunn seeks redress pursuant to the ERISA section which provides as follows:

A civil action may be brought by a participant or beneficiary ... to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to

future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B) (West 2001).

■ The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan gives such discretionary authority, the trust principles inherent in ERISA "make a deferential standard of review appropriate ...." *Id.* at 111, 109 S.Ct. 948 (citing Restatement (Second) of Trusts § 187 (1959)). This deferential standard of review, referred to as the "arbitrary and capricious" standard, enables a court to "overturn a decision to deny benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995) (internal quotation marks and citations omitted).

■ The section of the LTD Plan on "Allocation of Authority" unambiguously grants Standard "full and exclusive authority" to administer and interpret the Plan. That section provides that:

> Except for those functions which the Group Policy specifically reserves to the Policy-owner, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application to of the Group Policy[.]
>
> Our authority includes, but is not limited to:

1. The right to resolve all matters when a review has been requested;
2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
3. The right to determine:
   a. Eligibility for insurance;
   b. Entitlement to benefits;
   c. Amount of benefits payable;
   d. Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Pavick Aff. Ex. A at D 10015–16. Although "magic words such as 'discretion' and 'deference' may not be 'absolutely necessary' to avoid a stricter *de novo* standard of review," clear use of such words supports a conclusion that there has been an unambiguous reservation of discretionary authority to determine eligibility for benefits and, accordingly, that the arbitrary and capricious standard of review applies. *Jordan v. Ret. Comm. Of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir. 1995).

■ The plaintiff claims that despite the unambiguous language of the LTD Plan, Standard's conduct shows that it has not retained discretionary authority to determine eligibility for benefits under the LTD Plan. Dunn premises this argument on the fact that Balfour's 1996 summary of benefits states that employees are entitled to 13 weeks of short-term disability benefits, but Balfour paid Dunn 26 weeks of benefits. Thus, Dunn argues, Balfour took on the function of determining eligibility for long-term disability benefits, and also took on the function of paying long-term disability benefits at the end of the 13 weeks. However, this argument is based on mere speculation. The defendants have estab-

lished that Balfour's policy at the relevant point in time was to provide 26 weeks of benefits under the STD Plan and that Balfour did not play a role in the determination of eligibility or administration of long-term disability benefits. Viewing all the evidence in the light most favorable to the plaintiff, she has failed to create a genuine issue of fact as to this contention. *See Weinstock,* 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

Thus, the court concludes that Standard has full discretionary authority under the LTD Plan, and consequently, the highly deferential arbitrary and capricious standard of review applies.

### 2. Standard's Actions Were Not Arbitrary or Capricious

In order to successfully oppose summary judgment in a case where the arbitrary and capricious standard of review applies, the plaintiff must show that there is a genuine issue of fact material to the question of whether Standard's decision to deny Dunn benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995) (internal quotation marks and citations omitted). In resolving that question, the finder of fact "must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ....'" *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814 (1971)). Additionally, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining

whether there has been an abuse of discretion.'" *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)).

■ The plaintiff has failed to establish that a genuine issue of material fact exists as to whether Standard's decision to deny benefits was supported by substantial evidence. Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker [and] ... requires more than a scintilla but less than a preponderance." *Sandoval v. Aetna Life &. Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir.1992) (internal quotation marks and citations omitted). Under the highly deferential arbitrary and capricious standard, the court "cannot reweigh the evidence so long as substantial evidence supports the plan administrator's determination." *Polizzano v. Nynex Sickness & Accident Disability Benefit Plan,* No. 99–7160, 1999 WL 710256 at *2 (2d Cir., Sept. 2, 1999).

■ Standard's determination that Dunn's disability was caused or contributed to by a pre-existing condition was based on a consideration of relevant factors. Those factors were as follows:

1. The negative results of the three laboratory tests for Lyme disease.

2. The fact that, although Dr. Fancher's reading of the tests apparently was contradicted by Dr. Keszler, Dr. Fancher had consulted with the director of the laboratory where the tests were conducted and obtained an explanation as to why the laboratory concluded the tests were negative for Lyme disease.

3. The absence of any notation at all by Dr. Keszler in her treatment notes concerning a complaint of a rash in November 1997, when the plaintiff claims her complaint was a red rash

on her back, and the fact that there was never any record of the type of unusual rash that is typical of Lyme disease.

4. Dr. Fancher's conclusion that the MRI and SPECT scan results were "nonspecific" for a diagnosis of Lyme disease; and

5. The fact that a review of the treatment notes of Dunn's visits with Dr. Petrelli and with Dr. Keszler showed that there was a general similarity of the plaintiff's symptoms (including depression and related symptoms) during and after the exclusion period.

Thus, the individuals involved in the decision-making process at Standard had before them evidence that a reasonable mind might accept as adequate when they concluded that Dunn did not have Lyme disease and that she had been treated for the same impairing condition during and after the exclusion period.

The plaintiff attempts to create a genuine issue of material of fact, as to whether Standard's denial of benefits was supported by substantial evidence, by arguing that Dr. Fancher was not sufficiently independent. She contends that when approximately 30 percent of a doctor's practice consists of work from one client, that doctor cannot be independent. However, the issue is not material in the context of this case. Even if the court assumes, *arguendo*, that Dr. Fancher (as opposed to Standard) was not independent and thus was operating under a conflict of interest, and weighs that conflict as a factor, there is nonetheless undisputed objective medical evidence to support Dr. Fancher's conclusions, namely the three sets of laboratory test results, which were negative for Lyme disease. Moreover, in view of the totality of the relevant factors, adding as a factor a conflict of interest on the part of Dr.

Fancher would not change the court's conclusion that there was no abuse of discretion by Standard here.

Based on the foregoing discussion, the court also concludes that the plaintiff has failed to create a genuine issue of material fact as to whether Standard's decision to deny benefits was without reason. The court notes that "[e]ven if the plaintiff's interpretation of the facts is as reasonable as the interpretation adopted by the plan administrator, the arbitrary and capricious standard requires the court to defer to the interpretation of the plan administrator." *Mormile v. Metro. Life Ins. Co.*, 91 F.Supp.2d 492, 495 (D.Conn.2000). The plaintiff does not argue that Standard's decision to deny benefits was erroneous as a matter of law.

Accordingly, the court concludes that Standard is entitled to summary judgment on Count I. In addition, Balfour is entitled to summary judgment on Count II because Dunn has failed to offer any evidence that it had any duty to pay her benefits under the LTD Plan.

### B. *Counts III and IV*

In Counts III and IV, the plaintiff claims that the actions of Standard and Balfour, respectively, constitute unfair and deceptive acts in the conduct of trade or commerce in violation of CUTPA. CUTPA provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a) (2001). In determining whether an act or practice is unfair, "CUTPA directs the courts of Connecticut to be guided by the interpretations given to the Federal Trade Commission Act by the F.T.C. [Federal Trade Commission] and the Federal courts." *Bailey Employment Sys., Inc. v. Hahn*, 545 F.Supp. 62, 68 (D.Conn.1982). Accordingly, the Federal Trade Commis-

sion's "cigarette rule" requires a consideration of the following three factors:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

*Rudel Mach. Co., Inc. v. Giddings & Lewis, Inc.,* 68 F.Supp.2d 118, 129 (D.Conn. 1999) (quoting *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 591, 657 A.2d 212 (1995)). "All three criteria need not be satisfied to support a finding of unfairness." *Omega Eng'g, Inc. v. Eastman Kodak Co.,* 908 F.Supp. 1084, 1099 (D.Conn.1995).

As the court finds that Standard's denial of benefits was neither arbitrary nor capricious and that it was not without reason, the plaintiff cannot succeed in asserting that Standard's conduct offended public policy, or that it was immoral and caused substantial injury. Thus, Standard is entitled to summary judgment on Count III.

Additionally, as the plaintiff has failed to offer any evidence that Balfour played a role in the denial of her LTD claim, Balfour is also entitled to summary judgment on Count IV.

## IV. *CONCLUSION*

For the reasons stated above, the Defendant's Motion for Summary Judgment [Doc. # 19] is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.